(CHANCERY.)

## THE TRUSTEES OF THE PHILADELPHIA BAPTIST ASSOCIATION *et al.* v. HART'S EXECUTORS.

In the year 1790, S. H., a citizen of Virginia, made his last will, containing the following bequest : " Item, what shall remain of my military certificates at the time of my decease, both principal and interest, I give and bequeath to *The Baptist Association, that for ordinary meets at Philadelphia annually*, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family." In 1792 the legislature of Virginia passed an act repealing all English statutes. In 1795 the testator died. The Baptist Association in question had existed as a regularly organized body for many years before the date of his will; and in 1797 was incorporated by the legislature of Pennsylvania, by the name of " The Trustees of the Philadelphia Baptist Association."

*Held*, that the Association, not being incorporated at the testator's decease, could not take this trust *as a society.*

VOL. IV.                 1

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

That the bequest could not be taken *by the individuals* who composed the Association at the death of the testator.

That there were no persons to whom this legacy, were it *not a charity,* could be decreed.

And, that it could not be sustained, in this Court, *as a charity.*

Charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a Court of Equity, either exercising its ordinary jurisdiction, or enforcing the prerogative of the king as *parens patriæ*, independent of the statute 43 Eliz.

If, *in England,* the prerogative of the king, as *parens patriæ*, would, independent of the statute of Elizabeth, extend to charitable bequests of this description : *Quære,* How far this principle would govern *in the Courts of the United States?*

*Held,* that it was unnecessary to enter into this inquiry, because it could only arise where the Attorney General is made a party.

IN the year 1790, Silas Hart, a citizen and resident of Virginia, made his last will in writing, which contains the following bequest. " Item, what shall remain of my military certificates at the time of my decease, both principal and interest, I give and bequeath to the Baptist Association that for ordinary meets at Philadelphia annually, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family." In 1792 the legislature of Virginia passed an act, repealing all English statutes, including that of the 43 Eliz. c. 4. In the year 1795 the testator died. The Baptist Association, which met annually at Philadelphia, had existed as a regularly organized body for many years before the date of this will, and was composed of the clergy of several Baptist churches of different States, and of an annual deputation of laymen from

the same churches. It was not incorporated until the year 1797, when it received a charter from the legislature of Pennsylvania, incorporating it by the name of " The Trustees of the Philadelphia Baptist Association." The executors having refused to pay the legacy, this suit was instituted in the Circuit Court for the district of Virginia, by the corporation, and by those individuals who were members of the Association at the death of the testator. On the trial of the cause, the judges of that Court were divided in opinion on the question, whether the plaintiffs were capable of taking under this will? Which point was, therefore, certified to this Court.

The *Attorney General*, for the plaintiffs, argued, that the peculiar law of charitable bequests did not originate in the statute of the 43d Eliz., which was repealed in Virginia before the death of the testator. If lands had been conveyed in trust, previous to the statute, for such purposes as are expressed in this will, the devise would have been held good at law ; and, consequently, the court of chancery would have enforced the trust, in virtue of its general equity powers, independent of that statute. The statute does not profess to give any validity to devises, or legacies, of any description, not before valid ; but only furnishes a new and more convenient mode for discovering and enforcing them; but the case before the court is such as requires the interposition only of the ordinary powers of a court of equity. Devises equally vague and indefinite, have been sustained in courts of common law. before the statute of Eliza-

beth, and would, *a fortiori*, have been supported in courts of equity.[a] And the Court of Chancery, exercising the prerogative of the king as *parens patriæ*, has been constantly in the habit of establishing charitable bequests of this nature. " In like manner," says Lord Chancellor Macclesfield, " in the case of charity, the king, *pro bono publico*, has an original right to superintend the care thereof, so that, abstracted from the statute of Eliz. relating to charitable uses, and antecedent to it, as well as since, it has been every day's practice to file informations in Chancery, in the Attorney General's name, for the establishment of charities."[b] So also, Lord Keeper Henly says, " and I take the uniform rule of this court, before, at, and after the statute of Elizabeth, to have been, that where the uses are charitable, and the person has in himself full power to convey, the court will aid a defective conveyance to such uses. Thus, though devises to corporations were void under statute Hen. 8., yet they were always considered as good in equity, if given to charitable uses."[c] The powers of the Court of Chancery over these subjects, are derived from, and exercised according to the civil law.[d] Lord Thurlow says, " the cases have proceeded upon notions adopted from the Roman and civil law, which are very favourable to charities, that legacies given to public uses, not ascertained, shall be applied to some

*a Porter's case,* 1 *Co. Rep.* 22. *b. Plowd.* 522.

*b* Eyre v. The Countess of Shaftsbury. 2 *P. Wms.* 119.

*c* Case of Christ's College, Cambridge, 1 *Sir W. Bl.* 91.

*d* 3 *Bl. Com.* 476. White v. White, 1 *Bro. Ch. Cas.* 15. Moggridge v. Thackwell, 7 *Ves.* 36.

proper object."[a]  By that law, bequests for charita- 1819.
ble purposes, *ad pios usos,* are not void for uncer-  Baptist As-
tainty.[b]  But, even supposing all the powers of the  sociation
English Court of Chancery over charities to have v.
Hart'sEx'rs.
been originally derived from the statute of Elizabeth,
still it does not follow, that the courts of the United
States have not all the powers which the English
courts of equity possessed, when this country was
separated from the British empire.  The chancery
system originated in various sources ; in the peculiar
jurisprudence of the court, which may be denomina-
ted its common law ; in statutes ; and in the authority
of the Chancellor, as keeper of the king's conscience.
It is difficult to find any chancery decisions wholly
purified from the influence of statutory provisions.
The grant of equity powers in the constitution, to the
national judiciary, extends " to *all cases* in equity."
It is not limited to those cases which arise under the
ordinary jurisdiction of the Court of Chancery.  This
is not a question of local law, nor can the equity ju-
risdiction of the United States' courts depend upon
the enactment or repeal of local statutes.  This court,
has already determined, that the remedies in the court
of the United States, in equity, are to be, not accord-
ing to the practice of State courts, but according to the
principles of equity as known and practised in that
country from which we derive a knowledge of those
principles.  In England, this bequest would, unques-
tionably, be sustained.  The Association, which was

a  White v. White, 1 *Bro. Ch. Cas.* 15.

b  *Swinb. part* 1. *sec.* 16.  *Part* 7. *sec.* 8.

c  Campbell v. Robinson, 3 *Wheat.* 212.

the object of the testator's bounty, though unincorporated at the time, was certainly as definite a body as the " sixty pious ejected ministers," in one case,[a] or " the charitable collections for poor dissenting ministers living in any county in England," in another.[b]   Nor was it necessary that they should be incorporated, in order to take.   A devise by an impropriator, directly " to one who served the cure, and all who should serve it after him," &c. has been carried into effect.[c]   So, if the devise be to a charitable use, though the object be not *in esse,* and though it depend on the will of the crown, whether it shall ever be called into existence, equity will establish it.[d]

Mr. *Leigh,* contra, contended, that the Association could not take the bequest, neither in their individual nor in their collective capacity.   Not as individuals ; because the persons composing the Association were continually fluctuating, and were not designated, nor indeed known, at the time of the bequest.   No personal benefit was intended to them. The testator's intent was to constitute the Association, in its collective capacity, trustee of the fund for this charitable purpose ; and whether the trust can be carried into effect or not, they cannot take individu-

*a* The Attorney General v. Baxter, 1 *Vern.* 248.   Attorney General v. Hughes, 2 *Vern.* 105.

*b* Walker v. Childs, *Amb.* 524.

*c* Anon. 2 *Vent.* 349.

*d* Lady Downing's case, *Amb.* 592.   Ayliff v. Dodd, 2 *Atk.* 328.   The Attorney General v. Oglander, 3 *Bro. Ch. Cas.* 166. The Attorney General v. Bowyer, 3 *Ves. jun.* 725.

ally to their own use.[a] Nor can they so take in their collective capacity, because not incorporated at the time : and the subsequent incorporation does not help their case.[b] Therefore, this is to be regarded as a bequest to charitable uses, without the intervention of trustees to take the legal estate and fulfil the uses. According to the law of Virginia, which must govern in this case, such a trust cannot be carried into effect by any court in any mode. Had such a case occurred in England, it is admitted that the Court of Chancery would carry the trust into effect by supplying legal and capable trustees to take and hold the fund for the objects of the testator's charity ; or, if those objects were not designated in the testator's will with sufficient certainty, would execute it, upon the doctrine of *cy pres*, for objects *ejusdem generis*, according to a scheme digested by the master. But the Court of Chancery in England exercises such powers solely in virtue of the statute of the 43d Eliz. All ancient precedents of the exercise of such powers, to effect such charitable uses, are expressly stated to be founded on that statute.[c] As all the early decisions are founded on the statute, so the more modern cases are founded on the authority of the ancient; with this only extension of their principle, that although the statute merely provides that

1819.

Baptist Association v. Hart'sEx'rs.

a Morrice v. The Bishop of Durham, 9 *Ves.* 399. S. C. 10 *Ves.* 522.

b 8 *Vin. Abr. tit. Devise, H. pl.* 1. Woodmore v. Woodroffe, *Amb.* 636.

c The Attorney General v. Rye, 2 *Vern.* 453. Rivett's case, *Moor*, 890. Pigott v. Penrice, 2 *Eq. Cas. Abr.* 191. *pl.* 6. The Attorney General v. Hickman, *Ib.* 193. *pl.* 14.

charitable donations shall be applied to such of the charitable uses therein expressed, for which they were appointed by the donors or founders, the Court of Chancery has gone a step farther, and held upon the equity of the statute, that where objects of charity are in any way pointed out, however vaguely and indefinitely, the Court will apply the fund to charitable uses of the same kind with those intended by the donor, according to a scheme digested by the Master.[a]　All the elementary writers and compilers concur in deducing the jurisdiction of the English Court of Chancery over charitable bequests from the statute of Eliz. ; tracing all the powers of the Court, as a court of equity, over this subject, to that source ; its liberality and favour toward charitable donations ; its practice of supplying all the defects of conveyances to charitable uses ; of substituting trustees where those named by the donor fail before the vesting of the legal estate ; and of taking on itself the execution of the trust, where incapable, or no, trustees are appointed by the donors.[b]　Indeed, no donation is considered in England as a donation to charitable uses, unless for such uses as are enumerated in the statute of Eliz., or such as are analogous.[c]　The very signification of

*a* Barlis v. The Attorney General, 2 *Atk.* 239.　White v. White, 1 *Bro. Ch. Cas.* 12.　Moggridge v. Thackwell, 3 *Bro. Ch. Cas.* 517.　S. C. 1 *Ves. Jun.* 464.　S. C. 7 *Ves.* 36.

*b* 2 *Bl. Com.* 376.　2 *Fonbl. Eq.* 213.　Roberts on *Wills,* 213, 214.　1 *Bac. Abr. tit. Ch. Uses.*　5 *Vin. Abr. same tit.*　1 *Burn's Eccles. Law, same tit.*

*c* The Attorney General v. Hewer, 2 *Vern.* 387.　Brown v. Yeale, 7 *Ves.* 50. note c.　Morrice v. The Bishop of Durham, 9 *Ves.* 399.　S. C. 10 *Ves.* 540.

the words *charity* and *charitable use* are derived from that statute. In the case last cited, Sir W. Grant said, " In this Court, the signification of charity is derived principally from the statute of Elizabeth. Those purposes are considered charitable which that statute enumerates, or which by analogies are deemed within its spirit and intendment."[a] Lord Eldon, in rehearing the same case, confirms the doctrine. " I say, with the Master of the Rolls, a case has not yet been decided, in which the Court has executed a charitable purpose, unless the will contains a description of that which the law acknowledges to be a charitable purpose, or devotes the property to purposes of charity in general."[b] In a previous case, Lord Loughborough had said, " It does not appear that the Court before that period, (the 43d of Eliz.,) had cognizance of informations for the establishment of charities. Prior to the time of Lord Ellesmere, as far as tradition in times immediately following goes, there were no such informations, but they made out the case as well as they could at law."[c] The repeal of the English statute of charitable uses by the legislature of Virginia, must be considered as almost, if not entirely, repealing that whole head of equity. The effect of this repeal may be estimated by recurring to the history of the system of equitable jurisprudence. Every part of that system has been built up since the 43d year of Elizabeth, and there is not a single chancery case, touching charitable bequests, prior to the

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

a Morrice v. The Bishop of Durham, 9 *Ves.* 399.
b S. C. 10. *Ves.* 540.
c The Attorney General v. Bowyer, 3 *Ves. jun.* 726.

1819.
Baptist As-
sociation
v.
Hart'sEx'rs.

statute of that year.   The Court is then driven
to ascertain either the common law method of effect-
ing charitable uses, or the jurisdiction of the English
Chancery, independent of the statute.    Lord Lough-
borough says, that it had no jurisdiction whatever
of the matter before the statute, and that they made
out the case as well as they could at law ; and he
instances certain cases.[a]    The jurisdiction of the
Court of Chancery in England, abstracted from, and
independent of, the statute of the 43d Eliz., may be
inferred from the course of the Court in cases where
the donors of charities, failing to point out any ob-
ject of charity, or designating improper, impolitic,
or illegal objects, the statute gives the Court no au-
thority to direct the charity to any definite purpose.
In all such cases, the disposition of the funds be-
longs to the king, as *parens patriæ*, and is made by
him under his sign manual.   In Moggridge v. Thack-
well,[b] Lord Eldon, after reviewing all the cases, (ac-
knowledging that they conflicted with each other,
and that his own mind was perplexed with doubts,)
came to this general conclusion, which he deemed
the most reconcileable to authorities ; that when the
execution of the trust for a charity is to be by a trus-
tee with general, or some objects pointed out, there
the Court will take upon itself the execution of the
trust : but where there is a general indefinite purpose,
not fixing itself on any object, the disposition is to be
made by the king's sign manual.   A due attention to

a Porter's Case, 1 *Co. Rep.* 23  Sutton's Hospital Case,
10 *Co. Rep.* 1.
b 7 *Ves.* 36.

the cases there collected by Lord Eldon, will show
that the first class of cases are those over which the
statute of the 43d Eliz. gives the Court a jurisdiction,
and which it will consequently exercise ; and that the
second class consists of those which belong to its ju-
risdiction, abstracted and independent of the statute,
and in which the disposition belongs to the king.[a]
So if the donation be to a charitable use, but one
which is deemed unlawful or impolitic, the disposi-
tion belongs to the king.[b]   And were it not for the
statute, all charitable donations, whatever, would be
subject to the disposition of the king, as *parens pa-
triæ*.   It is true, there are some *dicta*, which at first
sight seem to support a different doctrine.   Such is
that of Lord Keeper Henly, in the case of Christ's
College.[c]   But this *dictum* is directly contradicted
by Lord Loughborough, in the Attorney General v.
Bowyer.[d]   Lord Keeper Henly cites no authority for
this *dictum;* but Lord Chief Justice Wilmot having,
in the case of Downing College,[e] said something of
the same kind, cites the authority which, doubtless,
Lord Keeper Henly had in his mind ; which is what
fell from Lord Macclesfield, in Eyre v. The Coun-
tess of Shaftsbury.   " And in like manner, in case
of charity, the king, *pro bono publico*, has an ori-

a The Attorney General v. Siderfin, 1 *Vern.* 224.   Fiser v.
Peacock, there cited.   The Attorney General v. Herrick,
*Ambl.* 712.

b The Attorney General v. Baxter, 1 *Vern.* 248.   De Costa
v. De Pas, *Amb.* 228.   Cary v. Abbott, 7 *Ves.* 490.

c *W. Bl.* 91.

d 3 *Ves. jun.* 726.

e *Wilm. Rep.* 1

ginal right to superintend the care thereof; so that, abstracted from the statute of Elizabeth relating to charitable uses, and antecedent to it, as well as since, it has been every day's practice to file an information in Chancery in the name of the Attorney General for the establishment of charities."[a] Whence it appears, that the information which might be filed in the attorney general's name, for the establishment of charities, abstracted from, and independent of, the statute, related to such as depended on the disposition of the king as *parens patriæ*. This explanation is corroborated by what is said by Lord Somers, in the case of Lord Falkland v. Bertie.[b] Lord Thurlow's *dictum*, in White v. White,[c] that " the cases had proceeded on notions derived from the Roman and civil law," cannot be construed to extend to the entire adoption of the civil law on charities. By the civil law, if a man make a will containing a charitable bequest, and afterwards cancel the will, the bequest to charity is not thereby revoked. It is otherwise by the law of England. So, in case of a deficiency of assets, the civil law gave a preference to charitable legacies ; but in the English Court of Chancery they abate in proportion.[d] The conclusion, then, is, that in every case of charity, wherein the English Court of Chancery has not jurisdiction to direct the application of the

a 2 *P. Wms.* 118, 119.

b 2 *Vern.* 342.

c 1 *Bro. Ch. Cas.* 15.

d The Attorney General v. Hudson, 1 *Coxe's P. Wms.* 675, and note.

charity, either by the words or the equity of the statute 43 Eliz., the disposition belongs to the king, as *parens patriæ*, and the Court of Chancery is only resorted to in order to enforce his disposition. That statute being repealed in Virginia, and no similar one enacted in that State, the disposition of all charitable donations is in the *parens patriæ* of Virginia. The Courts of the United States cannot direct this charity, or carry it into effect. It is the government of Virginia which is the *parens patriæ* of that State. At the revolution, all the rights of the crown devolved on the commonwealth; and still remain in the commonwealth, except such as are delegated to the United States by the national constitution. But none of the rights that appertain to the State government, as *parens patriæ*, are delegated to the United States. Can this, or any other Court of the United States, pretend to the care or guardianship of infants, lunatics, and ideots? If not, neither can they undertake the direction of a charity, which stands on the same footing as belonging to that government which is *parens patriæ*. Even, therefore, if it were admitted that the Court of Chancery of Virginia could carry this bequest to charitable uses into effect, the Courts of the United States cannot. Another objection to the jurisdiction of those courts is, that the Attorney General (that is, of Virginia) representing the *parens patriæ*, must be made a party.[a] But

1819.

Baptist Association
v.
Hart'sEx'rs.

a *Mitf. Plead.* 7. 93, *Cooper's Plead.* 219. *Anon.* 3 *Atk.* 277. 2 *Atk.* 87. Monell v. Lawson, 5 *Vin. Abr. tit. Char. Uses, Ib. pl.* 11. The Attorney General v. Hewett, 9 *Ves.* 432.

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

to make the Attorney General of Virginia, that is,
the State of Virginia, a party defendant, would be.
contrary to the constitution of the United States.
There is a farther, and an insurmountable objection
to the jurisdiction of the United States' Courts in
cases of charity, where there is no trustee appointed,
or (which is the same thing) unascertainable and
incapable trustees are appointed. If not the whole
jurisdiction of the English Court of Chancery, at
least so much of it as is abstracted from, and inde-
pendent of, the statute 43 Eliz., belongs neither to its
ordinary nor extraordinary jurisdiction, but to the
Lord Chancellor personally, as delegate to the king.
But by the constitution and laws of the United
States, the only branch of the English Chancery
jurisdiction which is vested in the Courts of the
United States, is the ordinary or equity jurisdiction
of the Court of Chancery in England. Finally :
It is impossible to give effect to this charity in any
mode. Not only are the trustees uncertain and un-
ascertainable, but the objects of the charity are also
uncertain, and not ascertainable by this Court. The
very idea of the Court attempting to execute the trust,
*cy pres*, and referring it to the Master to digest a
scheme for that purpose, is absurd and impractica-
ble.

The *Attorney General*, in reply, insisted, that if it
were necessary to show the capacity of the plaintiffs as
trustees, it could be done. *Id certum est quod certum
reddi potest :* and the Court might direct the money
to be paid to those who constituted the Association at

the time of the bequest. But this Association was incorporated shortly after the death of the testator; and it is sufficient to support the charity, that its objects *may be in esse.* The first of the two cases, cited to show that the devise must take effect at the time, or not at all, was a devise of lands *to the priests of a chantry or college in the church of* A.; and there were none such, neither chantry, college, nor priests.[a] But suppose there had been, as in the case now before the court, would their want of a corporate character have defeated the devise? But this case is entirely inapplicable. The objects designated did not exist even under the description which the testator used. Nor did they exist, at the time of the decision, so as to present the question as to the efficacy of the devise in that respect; and all that the court said upon this subject, must be regarded as extrajudicial. The whole question was on a devise of lands on the rigid rules of the common law. The case of Widmore v. Woodroffe,[b] was a bequest of money to the corporation of Queen Anne's County to augment poor vicarages, which was held to be void by the statute of Mortmain, as the corporation were bound by their rules to lay out their donations in lands. It does not touch the question, whether a devise of a charity must take effect at the death of the testator, or not at all. But if the court should think, that the Baptist Association were incapable of taking, as trustees, at the death of the testator, and that there must be some person then *in esse,* to hold the legal estate, the

---

[a] 8 *Vin. Abr. Tit. Devise, H. pl.*    [b] *Amb.* 636

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

executors will be considered, by a court of equity, as trustees, whether so named or not.[a] So, also, the court will regard the heir as a trustee for the same purpose.[b] The case of the Attorney General v. Bowyer, was decided on this very principle. The law had thrown the legal title on the heir, but he was held responsible for the intermediate profits in the imputed character of a trustee.[c] The position, that the English Court of Chancery derives the jurisdiction now in question from the statute of Eliz., is denied. The title of the act is, " *Commissioners*, authorized to inquire of misemployment of lands or goods, given to hospitals, &c. which, by *their* orders, shall be reformed." The preamble recites, that whereas lands, &c. had been theretofore given, limited, appointed, and assigned, to various objects which are specified, which lands, &c. had not been employed " according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those that should pay, deliver, and employ the same." It is clear, from this preamble, that no new validity was intended to be given to these donations. Their previous validity is admitted; and the mischief was, that they had been defeated by the frauds, breaches of trust, and negligence of those who should have paid them. Frauds and breaches of trust were, at this time, known heads of the equitable jurisdiction of the Court of Chancery; but the statute proceeds to provide a new remedy for

---

*a* 1 *Bridg. Index,* 761.　　　　*b* 2 *Bridg. Index,* 607.
*c* 3 *Ves. jun.* 726.

the mischief announced in the preamble. This is the appointment of commissioners, with powers to institute an inquisition to detect the frauds which had been practised; authorizing the commissioners, conformably to the title of the act, to make orders to carry the intention of the donor into effect; and allowing the party injured by such orders, to complain to the Chancellor for an alteration or reversal of such orders. Even supposing the statute did profess to confer on the Court of Chancery a new jurisdiction, it is merely an appellate jurisdiction from the decrees of the commissioners; and this appeal is given to one party only, he who is charged with the fraud. So that, it is neither an *original* jurisdiction, nor is it a jurisdiction *to enforce a charitable trust.* The eighth and ninth sections of the act direct the Commissioners to certify their decrees into the high Court of Chancery of England, and the Chancery of the Palitinate of Lancaster, and direct the Chancellors to take such order for the due execution of the decrees (of the commissioners) as to them shall seem fit and convenient. This is not a power to make a decree, but to execute the decrees made by the Commissioners. The 10th section reiterates the appellate power of the Chancellor, recognized by the 1st section. The only principles the 10th section prescribes for the regulation of the Chancellor on these appeals, are so far from being new to the court, that they have existed ever since its equitable jurisdiction commenced.—If, then, the jurisdiction of the Court of Chancery over charitable bequests, cannot be derived from the letter of the statute of Eliz., can it be sup-

1819.

Baptist Association
v.
Hart'sEx'rs.

1819.

Baptist Association
v.
Hart'sEx'rs.

ported from ancient adjudged cases, interpretative of that statute? Even if it could, this would be but a frail support; because the Court of Chancery was then in the infancy of its existence, and grasping at every thing to enlarge that jurisdiction which time and usage have since consecrated; and because if its jurisdiction to enforce a charity by original bill, is to depend upon the statute, it has been shown from the statute itself, that it cannot be sustained. But the adjudged cases do not support the position, that the jurisdiction of the Court over charities is derived from the statute. It is necessary, however, to distinguish between the two questions, whether a particular charity is within the statute? and, whether the original jurisdiction of the Court of Chancery is derived from the statute? The first question properly arises, where the commissioners have acted, and the Court is reviewing their decree in its appellate character. As the commissioners derive their whole authority from the statute, and are therefore confined to the cases enumerated in it, the first question upon the threshold of the appeal is, whether the case on which they have acted, be within the statute. Of this description are the cases cited on the other side, as being the ancient cases, upon the authority of which the modern cases have been decided. The cases of the Attorney General v. Rye[a] and Rivett's Case,[b] are expressly stated by the reporters to have come before the Chancellor on exceptions to the orders of the

a 2 *Vern.* 453.          b *Moor*, 890.

commissioners. Piggot v. Penrice,[a] is given by the editor on the authority of another reporter.[b] On looking into the original report, it will be seen that the question of the statute was not involved in the case as it stood before the Chancellor. The only questions before him were, 1st. Whether any estate in lands passed to an executor by the words, " I make my niece Gore, since married to Sir Henry Penrice, executrix of all my goods, *lands*, and chattels" ? and, 2dly. What writing would amount to a revocation of a will ? At the end of the report there is a note in these words : " Note, the testatrix, by her second will, gave part of these lands to charitable uses, and they were decreed *at the rolls* to be good, as an appointment upon the act of parliament, notwithstanding there was no revocation; but that point was not now in question."[c] How this question came before the Master of the Rolls does not appear; but all that is decided is, that the charity was within the statute, which leaves the question of the original jurisdiction of the Court over charities untouched. The last ancient case cited, is that of the Attorney General v. Hickman.[d] A testator gave his estate to B. and his heirs, &c. by a will duly executed ; and by a codicil not attested by three witnesses, declared the use in these words : " I would have the same employed for the encouraging such non-conformist ministers as preach God's word, and in places where the people are not able to allow them a sufficient maintenance ; and for encouraging the

1819.

Baptist Association.
v.
Hart'sEx'rs.

a 2 *Eq. Cas. Abr.* 191.    b *Gilb. Eq. Rep.* 137.
c *Ib.*    d 2 *Eq. Cas. Abr.* 193.

bringing up some to the work of the ministry who are designed to labour in God's vineyard among the dissenters. The particular method how to dispose of it, I prescribe not, but leave to their discretion, designing you (B.) to take advice of C. and D." This bequest, analogous to that now before the Court, though much more vague and general, was confirmed; and the money decreed to be distributed immediately, and not made a perpetual charity. But nothing is said of the statute of Elizabeth, either in the argument, or in the opinion of the Court. The question was, whether B., and his testamentary advisers, C. and D., having all died before the testator, the Court could supply trustees. The counsel who contended for this power in the Court, supported it, not by the statute, but by the general authority of the Court; instancing a legacy bequeathed in trust, and the death of the trustee, which, in equity, would not defeat the bequest. The Court sustained its authority without assigning any particular ground; and it may, therefore, be fairly inferred, that the Court adopted the ground assumed in the argument. The case is cited from a manuscript report, and another note of the case, in the margin, goes no farther than to say, that it was considered as being within the description of the statute of Elizabeth, but does not profess to found the power of the Court over the case upon that statute.—Nor do the cases cited to show that the power of the Court to give effect to a vague devise by the rule of *cy pres* is founded upon the statute, support that position. In the case of Baylis v.

The Attorney General,[a] 200*l.* were given under the will of Mr. Church, " to the ward of Bread Street, according to Mr. ——, his will." Lord Hardwicke, after rejecting testimony to fill the blank, proceeds thus : " Though the alderman and inhabitants of a ward are not, in point of law, a corporation, yet, as they have made the Attorney General a party, in order to support and sustain the charity, I can make a decree that the money may, from time to time, be disposed of in such charities as the alderman, for the time being, and the principal inhabitants, shall think the most beneficial to the ward." Nothing is said of the statute ; and the circumstance of making the Attorney General a party points rather to the exercise of the king's prerogative, as *parens patriæ,* which is independent of the statute. In White v. White,[b] the testator bequeathed one moiety of the residue of his personal estate to the *Foundling,* and the other to the *Lying-in Hospital,* and if there should be more than one of the latter, then to such of them as his executors should appoint. The testator struck out the name of his executor, and never appointed another. Lord Thurlow held that this was no revocation of the legacy, and referred it to a master to which of the Lying-in hospitals it should be paid; but he does not countenance the idea of the power thus exercised by him being derived from the statute of Eliz. On the contrary, he refers it to notions derived from the Roman and civil law. Moggridge v. Thackwell[c] was a gift of a residue to I.

1819.

Baptist Association
v.
Hart'sEx'rs.

a 2 *Atk.* 239. -    b 1 *Bro. Ch. Cas.* 12.
c 3 *Bro. Ch. Cas.* 517.

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

Vaston, to such charitable uses as he should appoint; but *recommending poor clergymen with large families and good characters.* I. V. died in the testator's lifetime. The charity was sustained and executed by the Court; but there is no allusion to the statute in the opinion of Lord Eldon. He says, "Vaston, if alive, could not claim this property for his own use. All the rules, both of the *civil and common law,* would repel him from taking the property in that way. This reduces it to *the common case of the death of a trustee, which cannot defeat the effect of a legacy.*" The second report of the same case does not vary the ground taken by the Court.[a] In the report of the case on the rehearing, all the cases are collated, yet nothing is delivered at the bar or from the bench referring the power of the court to the statute of Eliz.[b] Lord Eldon, speaking of former decisions, says, " In what the doctrine (of *cy pres*) originated, whether as supposed by Lord Thurlow, in White and White, in the principles of the civil law as applied to charities, or in the religious notions entertained in this country, I know not."[c] A strange doubt, if the doctrine originated in the statute!—Nor are the elementary writers and compilers understood as deducing the jurisdiction from the statute. Blackstone, who is cited for this purpose, is treating of a different subject in the passage of his Commentaries referred to.[d] Having stated in a preceding page that corporations were excepted from the statutes of wills of 32 Hen. VIII. c. 1., and 34 Hen. VIII. c. 5., he says in the page cited, that the statute

a 1 *Ves. jun.* 464.          b 7 *Ves.* 36.
c *Ib.* 69.                         d 2 *Bl. Com.* 376.

of 43 Eliz. c. 4. is considered as having repealed that of Hen. VIII. so far as to admit a devise to a corporation for a charitable use; he then speaks of the liberal construction which had been given to devises under this statute by force of the word *appointment*; but does not even insinuate that it was the origin of the chancery jurisdiction.   All the other elementary writers and compilers cited are equally remote from proving the position assumed.   Their remarks are directed to the liberal construction put upon the word *appoint* under the statute of Eliz.; but the principles to be extracted from all the cases cited by them are the principles of the civil law, by which the Court had been guided antecedent to, and independent of, the statute.   The Attorney General v. Hever,[a] which is cited to prove that no donation is considered in England as a charitable donation, unless for the uses enumerated in the statute, or for analagous uses, was a devise to a school; and the Lord Keeper decided that not being a free school, the charity was not within the statute, and, consequently, the inhabitants had not a right to sue in the name of the attorney general. This is a very different position from that which the case was cited to prove; and it is an unfounded position : for the statute authorizes no proceeding in the name of the attorney general ; and it is admitted that the attorney general might, and had, informed in the name of the king as *parens patriæ*, previous to, and independent of, the statute.   Brown v. Yeale is merely stated in a note, and settles nothing.[b]   It is true, the

1819.

Baptist As-
sociation
v
Hart'sEx'rs.

a 2 *Vern.* 387.         b 7 *Ves.* 50. note, (e)

statute of Eliz., having enumerated charities, gave a
new technical name to a portion of the uses and trusts
recognized by the civil law.   It is this idea which
the Master of the Rolls pursues in Morrice v. The
Bishop of Durham.[a]   The trust before the Court was
for *such objects of benevolence and liberality, as her
executor in his own discretion should most approve of.*
Sir W. Grant determined that this was not within
the description of charitable trusts under the statute;
that purposes of liberality and benevolence do not
necessarily mean the same as objects of charity.
With regard to charities, he says, that it had been
settled upon authorities which it was too late to con-
trovert, that they should not fail on account of their
generality, but that in some cases their particular
application should be directed by the king, and in
others by the Court.   But he does not say that the
king or the Court derived this power of direction from
the statute.   The statute is looked at, to see if the be-
quest be a charity within it ; but the powers of control
and direction in the king and the Court are derived from
the original respective authority of the one as *parens
patriæ*, and of the other as a court of equity.   It is ad-
mitted, by the clearest implication, that although the
bequest was not a charity within the statute, yet if any
definite object had been indicated by the will for which
the money could have been decreed, it would have
been so decreed.   On the rehearing of the same
case, Lord Eldon merely confirms the same princi-
ples.[b]   But Lord Loughborough is supposed to have

*a* 9 *Ves.* 399.        *b* 10 *Ves.* 522.

attributed the jurisdiction to the statute, in express
terms, in the case of the Attorney General v. Bowyer.[a]
But to understand his words correctly, it is neces-
sary to observe, that the 43d of Elizabeth's reign,
was the year 1601, and that Lord Ellesmere received
the seals in 1603, the epoch of her decease, and of
the accession of James I.   The point under Lord
Loughborough's consideration was the title to inter-
mediate rents and profits, in the case of a trust to
take effect *in futuro.*   He first considers the question
as to the legal right, and introduces Porter's case,[b] and
that of the Sutton Hospital.[c]   The case of Porter,
he says, was upon a devise before the statute of wills,
(32 Hen. VIII. c. 1.) and before the statute of
uses, (27 Hen. VIII. c. 10.) and, consequently, before
the statute of Eliz.   " It does not appear, that the
Court before that period had cognizance of informa-
tions for the establishment of charities."   At what
period ?   Not the 43d Eliz., as has been contended;
but either the period of the devise, which was in the
32d of Hen. VIII., or of the decision, which was
in the 34th of Elizabeth.   The Chancellor proceeds,
" Prior to the time of Lord Ellesmere, as far as the
tradition in times immediately following goes, there
was no such information as that upon which I am
now sitting, but they made out the case as well as
they could at law."   The phrase, " prior to the time
of Lord Ellesmere," cannot be considered as equi-
valent to *prior to the 43d of Eliz.*; for there is no
coincidence in point of time.   The idea is singularly
expressed, if he meant to deduce the practice and au-

*a* 3 *Ves.* 726.      *b* 1 *Co. Rep.* 22. *b.*      *c* 10 *Co. Rep.* 1.

thority of informations from the statute of the 43d of Elizabeth. All that he really meant was to affirm, that the practice of proceeding on informations by the Attorney General grew up in the time of Lord Ellesmere. But this position is contradicted by Lord Keeper Henly,[a] by Lord Macclesfield,[b] by Lord Sommers,[c] by Lord Thurlow;[d] and, finally, by the admission on the opposite side, that the proceeding of the Attorney General, was as representing the king in his character of *parens patriæ.* The Chancellor next proceeds to establish the validity of these devises at common law, and consequently independent of the statute; and coming to the exercise of the equitable jurisdiction, he expressly founds it on the general power of the Court over trusts. It results, then, that by the civil law, devises to pious and public uses were liberally expounded, and not suffered to fail by their uncertainty; that the Ecclesiastical Courts, and Courts of Equity, acting on ecclesiastical subjects, when called upon to take cognizance of a devise to pious or public uses, exercised all the powers before the statute which have been since exercised: that the statute of Eliz. came, and following up the principle of the civil law, made an enumeration of those gifts to pious and public uses, under the new name of charitable uses; not to give them new validity, but to discover them by inquisition, and to effectuate them upon civil law principles. After the statute, the new name of *charitable uses,* became the fashion of the Court; and the word *ap-*

a  1 *W. Bl.* 91.          c  2 *Vern.* 342.
b  2 *P. Wms.* 119.       d  1 *Bro. Ch. Cas.* 15.

*pointment* was extended to produce the same effect whi:h Swinburne had ascribed to the civil law before. It became unnecessary to look back beyond the statute for the exercise of power over a charitable use: the case was brought within the statutory description, and if found within it, the constructive power of the word appointment was brought to bear upon it. Whatever be the origin of the powers of the Court of Chancery in England, whether derived from the peculiar law of the Court itself, from statutes, or from the extraordinary jurisdiction of the Chancellor, they are all vested in the Courts of the United States, by the constitution giving to them jurisdiction of *all suits in equity* between citizens of different States. There is no necessity that the Attorney General of Virginia should be made a party, because that is only required where the objects of the charity contravene the policy of the law; nor is it necessary that the Court should superintend the execution of the trust, since the trustees are appointed by the testator; nor that the Court should refer it to a Master to digest a scheme for its application, as the objects are clearly designated in the will.

1819.

Baptist Association
v.
Hart'sEx'rs.

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

*Feb.* 2d,
1819.

It was obviously the intention of the testator, that the Association should take in its character as an Association; and should, in that character, perform the trust created by the will. The members composing it must be perpetually changing; but, however they might change, it is " The Baptist Association that

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.
for ordinary meets at Philadelphia annually," which is to take and manage the " perpetual fund" intended to be created by this will. This Association is described with sufficient accuracy to be clearly understood; but, not being incorporated, is incapable of taking this trust as a society. Can the bequest be taken by the individuals who composed the Association at the death of the testator ?

The bequest could not be taken by the individuals who composed the Association.
The Court is decidedly of opinion that it cannot. No private advantage is intended for them. Nothing was intended to pass to them but the trust; and that they are not authorized to execute as individuals. It is the Association for ever, not the individuals, who, at the time of his death, might compose the Association, and their representatives, who are to manage this " perpetual fund."

At the death of the testator, then, there were no persons in existence who were capable of taking this bequest. Does the subsequent incorporation of the Association give it this capacity ?

The subsequent incorporation of the Association did not give it the capacity of taking this bequest.
The rules of law compel the Court to answer this question in the negative. The bequest was intended for a society which was not at the time, and might never be, capable of taking it. According to law, it is gone for ever. The legacy is void; and the property vests, if not otherwise disposed of by the will, in the next of kin. A body corporate afterwards created, had it even fitted the description of the will, cannot devest this interest, and claim it for their corporation.

There being no persons who can claim the right to execute this trust, are there any who, upon the

general principles of equity, can entitle themselves to its benefits? Are there any to whom this legacy, were it not a charity, could be decreed?

1819.

Baptist As-
sociation

v.

Hart'sEx'rs.

This question will not admit of discussion. Those for whose ultimate benefit the legacy was intended, are to be designated and selected by the trustees. It could not be intended for the education of all the youths of the Baptist denomination who were designed for the ministry; nor for those who were the descendents of his father, unless, in the opinion of the trustees, they should appear promising. These trustees being incapable of executing this trust, or even of taking it on themselves, the selection can never be made, nor the persons designated who might take beneficially.

There are no persons who could entitle themselves to the benefit of this legacy, were it not a charity.

Though this question be answered in the negative, we must still inquire, whether the character of this legacy, as a charity, will entitle it to the protection of this Court?

The legacy not sustainable in this Court, as a charity.

That such a legacy would be sustained in England, is admitted. But, it is contended for the executors, that it would be sustained in virtue of the statute of the 43d of Elizabeth, or of the prerogative of the crown, or of both; and not in virtue of those rules by which a Court of Equity, exercising its ordinary powers, is governed. Should these propositions be true, it is farther contended, that the statute of Elizabeth does not extend to the case, and that the equitable-jurisdiction of the Courts of the Union does not extend to cases not within the ordinary powers of a Court of Equity.

Such a lega-
cy would be sustained in England.

On the part of the plaintiffs, it is contended, that the peculiar law of charities, does not originate in the statute of Elizabeth. Had lands been conveyed in trust, previous to the statute, for such purposes as are expressed in this will, the devise, it is said, would have been good at law; and, of consequence, a Court of Chancery would have enforced the trust in virtue of its general powers. In support of this proposition, it has been said, that the statute of Elizabeth does not even profess to give any validity to devises or legacies, of any description, not before good, but only furnishes a new and more convenient mode for discovering and enforcing them; and that the royal prerogative applies to those cases only where the objects of the trust are entirely indefinite; as a bequest generally to charity, or to the poor.

It is certainly true, that the statute does not, in terms, profess to give validity to bequests acknowledged not before to have been valid. It is also true, that it seems to proceed on the idea that the trusts it is intended to enforce, ought, in conscience, independent of the statute, to be carried into execution. It is, however, not to be denied, that if, at the time, no remedy existed in any of the cases described, the statute gives one. A brief analysis of the act will support this proposition.

It authorizes the Chancellor to appoint commissioners to inquire of all gifts, &c. recited in the act, of the abuses, &c. of such gifts, &c.; and upon such inquiry to make such order as that the articles given, &c. may be duly and faithfully employed, to and for the charitable uses and intents, before rehearsed

respectively, for which they were given, &c. The
statute then proceeds, " which orders, judgments,
and decrees, not being contrary or repugnant to
the orders, statutes, or decrees, of the donors, or
founders, shall, by the authority of this present par-
liament, stand firm and good according to the tenor
and purport thereof, and shall be executed accord-
ingly, until the same shall be undone or altered by
the Lord Chancellor of England," &c.

Subsequent sections of the act direct these decrees,
&c. to be certified to the Chancellor, who is to take
such order for their execution as to him shall seem
proper ; and, also, give to any person aggrieved the
right to apply to Chancery for redress.

It is not to be denied, that if any gifts are enume-
rated in this statute, which were not previously valid,
or for which no previous remedy existed, the statute
makes them valid, and furnishes a remedy.

That there were such gifts, and that the statute has
given them validity, has been repeatedly determined.
The books are full of cases, where conveyances to
charitable uses, which were void by the statute of
mortmain, or were, in other respects, so defective,
that, on general principles, nothing passed, have been
sustained under this statute. If this statute restores
to its original capacity, a conveyance rendered void by
an act of the legislature, it will, of course, operate
with equal effect on any legal objection to the gift
which originates in any other manner, and which a
statute can remove.

The authorities to this point are numerous. In the
case of the Attorney General, on behalf of St. John's

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

The English
statute, 43d of
Elizabeth,
gives validity
to some devises
to charitable
uses, which
were not valid,
independent of
that statute.

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

College in Cambridge v. Platt,[a] the name of the cor-
porate body was not fully expressed. This case was
referred by the Chancellor to the judges, who certi-
fied, that though, according to the general principles
of law, the devise was void ; yet it was good under
the statute of Elizabeth. This case is also reported
in *Cases in Chancery*, 267. where it is said, the
judges certified the devise to be void at law, but the
Chancellor decreed it good under the statute.

So, in *Chancery Cases*, 134. it was decided, that a
bequest to the parish of Great Creaton was good
under the statute. Though this case was not fully
nor clearly reported, enough appears to show that
this bequest was sustained only under the statute of
Elizabeth. The objections to it were, that it was
void on general principles, the parish not being incor-
porated ; and that it would not be decreed under the
statute, the proceedings not being before commission-
ers, but by original bill. The Master of the Rolls
ordered precedents to be produced ; and, on finding
one in which four judges had certified that a party
might, under the statute, proceed in chancery by
original bill, he directed the legacy to be paid. Could
this bequest have been sustained on doctrines appli-
cable to charities independent of the statute, no ques-
tion could have arisen concerning the rights to pro-
ceed by original bill.

In Collison's case,[b] the will made John Bruet and
others, " feoffees of a home, to keep it in reparation,
and to bestow the rest of the profits on reparation of

*a Finch*, 221.                    *b Hob.* 136.

certain highways." On a reference by the Chancellor, the judges declared, that "this case was within the relief of the 43d of Elizabeth; for, though the devise were utterly void, yet it was within the words limited and appointed for charitable uses."

In these cases, it is expressly decided, that the bequests are void, independent of the statute, and good under it. It furnishes no inconsiderable additional argument, that many of the gifts recited in the 43 Eliz., would not, in themselves, be considered as charitable; yet they are all governed by the same rule. No dictum has been found indicating an opinion that the statute has no other effect than to enable the Chancellor to inquire, by commission, into cases before cognizable in his Court by original bill. It may, then, with confidence be stated, that whatever doubts may exist in other points which have been made in the cause, there is none in this: The statute of the 43d of Eliz. certainly gave validity to some devises to charitable uses, which were not valid, independent of that statute. Whether this legacy be of that description, is a question of more difficulty.

The objection is, that the trust is void; and the description of the *cestui que trust* so vague, that no person can be found whose interest can be sustained.

The counsel for the plaintiff insists, that cases equally vague have been sustained in Courts of common law, before the statute; and would, *a fortiori*, have been sustained in Courts of equity. He relies on Porter's case,[a] and on *Plowden*, 522.

Porter's case is this: Nicholas Gibson, in the 32d

1819.

Baptist Association
v.
Hart's Ex'rs.

Charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, exercising its ordinary jurisdiction, independent of the statute 43 Eliz.

---

[a] 1 Co. Rep. 22. b.

Hen. VIII., devised a wharf and house to his wife, upon condition that she should, on advice of learn-ed counsel, in all convenient speed after his decease, assure, give, and grant the said lands and tenements, for the maintenance, for ever, of a free school the testator had erected, and of alms men and alms women attached to it. The wife entered into the property, and, instead of performing the condition, conveyed it, in the 3d of Edw. VI., by a lease for forty years. Afterwards, in the 34th of Eliz., the heir at law entered for a condition broken, and conveyed to the queen. On the validity of this entry and conveyance the cause depended.

On the part of Porter, who claimed under the lease, it was contended, that the use was against the act of the 22d of Hen. VIII. c. 10. and, therefore, void, on which the estate of the wife became absolute.

On the part of the queen, it was argued, 1st. That the statute of Hen. VIII. avoided superstitious, and not charitable uses. But if it extended to this, still, that it made the use, and not the conveyance, void. The devisee, there being no consideration, would stand seized to the use of the heir. 2d. That in case the devise is to the wife, on condition that she would, by the advice of learned counsel, assure his lands for the maintenance of the said free-school, and alms men and alms women; this might be done lawfully, by procuring the king's letters patent incorporating them, and, afterwards, a letter of license to assure the lands to them

Upon these reasons the Court was of opinion, that

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

the condition was broken, and that the entry of the heir was lawful.

In this case no question arose concerning the possibility of enforcing the execution of the trust. It was not forbidden by law; and, therefore, the trustee might execute it. On failing so to do, the condition on which the estate was given was broken, and the heir might enter; but it is not suggested that the *cestui que trust* had any remedy. An estate may be granted on any condition which is not against law, as that the grantee shall go to Rome; and for breach of that condition, the heir may enter, but there are no means of compelling the journey to Rome. In the argument of Porter's case, the only mode suggested for assuring to the school the benefit intended, is by an act of incorporation, and a letter of license.

In considering this case, it seems impossible to resist the conviction, that Chancery could, then, afford no remedy to the *cestui que trust.* It is not probable that those claiming the beneficial interest would have waited, without an effort, from the 32d of Hen. VIII. when the testator died, or, at any rate from the 3d of Edw. VI., when the condition was conclusively broken by the execution of the lease, until the 34th of Eliz., and then have resorted to the circuitous mode of making an arrangement with the heir at law, and procuring a conveyance from him to the queen, on whose will the charity would still depend, if a plain and certain remedy had existed, by a direct application to the Chancellor.

If, as there is much reason to believe from this, and from many other cases of the same character

1819.

Baptist Association
v.
Hart'sEx'rs.

which were decided at law anterior to the statute of Eliz., the remedy in Chancery was not then afforded, it would go far in deciding the present question; it would give much countenance to the opinion, that the original interference of Chancery in charities, where the *cestui que trust* had not a vested equitable interest which might be asserted in a Court of Equity, was founded on that statute, and still depends on it.

These cases, and the idea they suggest, that at the time Chancery afforded no remedy for the aggrieved, account for the passage of the statute of the 43d of Elizabeth, and for its language, more satisfactorily than any other cause which can be assigned.

If, as has been contended, charitable trusts, however vague, could then, as now, have been enforced in Chancery, why pass an act to enable the Chancellor to appoint commissioners to inquire concerning them, and to make orders for their due execution, which orders were to be revised, established, altered, or set aside, by him ? If the Chancellor could accomplish this, and was in the practice of accomplishing it in virtue of the acknowledged powers and duties of his office, to what purpose pass the act ? Those who might suppose themselves interested in these donations, would be the persons to bring the case before the commissioners ; and the same persons would have brought it before the Chancellor, had the law afforded them the means of doing so. The idea, that the commissioners were substituted for the Court as the means of obtaining intelligence not otherwise attainable, or of removing inconveniences in prosecuting claims by original bill which had been found so

great as to obstruct the course of justice, is not warranted by the language of the act, and is disproved by the efforts which were soon made, and which soon prevailed, to proceed by way of original.

1819.

Baptist Association
v.
Hart'sEx'rs

The statute recites, that whereas lands, money, &c. had been heretofore given, &c. some for the relief of aged, impotent, and poor people, &c. which lands, &c. " nevertheless, have not been employed according to the charitable intent of the givers and founders thereof, by reason of"—what? of the difficulty of discovering that such trusts had been created? or of the expensiveness and inconvenience of the existing remedy? No. " By reason of frauds, breaches of trust, and negligence in those that should pay, deliver, and employ the same." That is by reason of fraud, breach of trust, and negligence of the trustees. The statute then proceeds to give a remedy for these frauds, breaches of trust, and negligences. Their existence was known when the act passed, and was the motive for passing it. No negligence or fraud is charged on the Court, its officers, or the objects of the charity; only on the trustees. Had there been an existing remedy for their frauds and negligences, they could not, when known, have escaped that remedy.

There seem to have been two motives, and they were adequate motives, for enacting this statute: The first, and greatest, was to give a direct remedy to the party aggrieved, who, where the trust was vague, had no certain and safe remedy for the injury sustained; who might have been completely defeated by any compromise between the heir of the feoffor

1819.

Baptist Association
v.
Hart's Ex'rs.

and the trustee; and who had no means of compelling the heir to perform the trust, should he enter for the condition broken. The second, to remove the doubts which existed, whether these charitable donations were included within the previous prohibitory statutes.

We have no trace, in any book, of an attempt in the Court of Chancery, at any time anterior to the statute, to enforce one of these vague bequests to charitable uses. If we have no reports of the decisions in Chancery at that early period, we have reports of decisions at common law, which notice points referred by the Chancellor to the judges. Immediately after the passage of the statute, we find, that questions, on the validity of wills containing charitable bequests, were propounded to, and decided by, the law judges. Collison's case was decided in the 15th of James I., only seventeen years after the passage of the act, and the devise was declared to be void at law, but good under the statute. Two years prior to this, Griffith Flood's case, reported in *Hobart*, was propounded by the Court of Wards to the judges; and, in that case too, it was decided, that the will was void at law, but good under the statute. Had the Court of Chancery taken cognizance before the statute, of devises and bequests to charitable uses, which were void at law, similar questions must have arisen, and would have been referred to the Courts of law, whose decisions on them would be found in the old reporters. Had it been settled before the statute, that such devises were good, because the use was charitable, these questions could not have arisen

afterwards; or, had they arisen, would have been differently treated.

Although the earliest decisions we have, trace the peculiar law of charities to the statute of Elizabeth, and although nothing is to be found in our books to justify the opinion, that Courts of Chancery, in the exercise of their ordinary jurisdiction, sustained, anterior to that statute, bequests for charitable uses, which would have been void on principles applicable to other trusts, there are some modern dicta in cases respecting prerogative, and where the proceedings are on the part of the king, acting as *parens patriæ*, which have been much relied on at the bar, and ought not to be overlooked by the Court.

1819.

Baptist Association
v
Hart'sEx'rs.
Charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, enforcing the prerogative of the king, as *parens patriæ*, independent of the statute 43d of Elizabeth.

In 2 *Peere Will.* 119. the Chancellor says, " In like manner, in the case of charity, the king, *pro bono publico*, has an original right to superintend the care thereof; so that, abstracted from the statute of Elizabeth relating to charitable uses, and antecedent to it, as well as since, it has been every day's practice to file informations in chancery, in the Attorney General's name, for the establishment of charities."

" 'This original right" of the crown, " to superintend the care" of charities, is no more than that right of visitation, which is an acknowledged branch of the prerogative, and is certainly not given by statute. The practice of filing an information in the name of the Attorney General, if, indeed, such a practice existed in those early times, might very well grow out of this prerogative, and would by no means prove, that, prior to the statute, the law respecting charities was what it has been since. These

words were uttered for the purpose of illustrating the original power of the crown over the persons and estates of infants, not with a view to any legal distinction between a legacy to charitable and other objects.

Lord Keeper Henly, in 1 *Sir Wm. Blackstone's Reports,* 91., says, " I take the uniform rule of this Court before, at, and after the statute of Elizabeth, to have been, that where the uses are charitable, and the person has in himself full power to convey, the Court will aid a defective conveyance to such uses. Thus, the devises to corporations were void under the statute of Hen. VIII. ; yet they were always considered as good in equity, if given to charitable uses."

We think we cannot be mistaken when we say, that no case was decided between the statute of mortmain, passed in the reign of Hen. VIII., and the statute of Elizabeth, in which a devise to a corporation was held good. Such a decision would have overturned principles uniformly acknowledged in that Court. The cases of devises, in mortmain, which have been held good, were decided since the statute of Elizabeth, on the principle, that the latter statute repeals the former so far as relates to charities. The statute of Geo. II. has been uniformly construed to repeal, in part, the statute of Elizabeth, and charitable devises comprehended in that act have, ever since its passage, been declared void. On the same reason, similar devises must, subsequent to the statute of Henry VIII. and anterior to that of Elizabeth, have been also declared void. It is remarka-

ble that, in this very-case, the Lord Keeper declares
one of the charities to be void, because it is contrary
to the statute of mortmain, passed in the reign of
Geo. II. All the respect we entertain for the Re-
porter of this case, cannot prevent the opinion, that
the words of the Lord Keeper have been inaccurately
reported. If not, they were inconsiderately uttered.

The principles decided in this case are worthy of
attention: " Two questions," says the report, " arose,
1st. Whether this was a conveyance to charitable uses
under the statute of Elizabeth, and *therefore*, to be
aided by this court. 2d. Whether it fell within the
purview of the statute of mortmain, 9th of Geo. II.
and was therefore a void disposition."

It is not even suggested that the defect of the con-
veyance could be remedied otherwise than by the
statute of Elizabeth. The Lord Keeper says, " the
conveyance of the 22d of June, 1721, is admitted
to be defective, the use being limited to certain
officers of the corporation, and not to the corpo-
rate body; and therefore there is a want of. persons
to take in perpetual succession." (The very defect
in the conveyance under the consideration of this
court.) " The only doubt," continues the Lord
Keeper, " is, whether the Court should supply this
defect, for the benefit of the charity, under the statute
of Elizabeth."

It is impossible, we think, to understand this decla-
ration, otherwise than as an express admission, that a
conveyance to officers, who compose the corporate
body, instead of the corporate body itself, or in other
words, a conveyance to any persons not incorporated

to take in succession, although for charitable purposes, would be void if not supported by the statute of Elizabeth.

After declaring the conveyance to be good, the Lord Keeper proceeds: " The conveyance, therefore, being established under the statute of Elizabeth, we are next to consider how it is affected under the statute of the 9th of Geo. II."

The whole opinion of the Judge, in this case, turns upon the statute of Elizabeth. He expressly declares the conveyance to be sustained by that statute, and in terms admits it to be defective without its aid. The dictum, therefore, that before that statute, courts were in the habit of aiding defective conveyances to charitable uses, either contradicts his whole opinion on the point before him, or is misreported. The probability is, that the Judge applied this dictum to cases which occurred, not to cases which were decided before the statute. This application of it would be supported by the authorities, and would accord with his whole opinion in the case.

In the case of the Attorney General v. Bowyer,[a] the Chancellor, speaking of a case which occurred before the passage of the statute of wills, says, " It does not appear that this Court, at that period, had cognizance upon information for the establishment of charities. Prior to the time of Lord Ellesmere, as far as tradition in times immediately following goes, there were no such informations as this on which I am now sitting, but they made out the case as well as they could by law."

a 3 Ves. Jun. 725.

Without attempting to reconcile these seemingly contradictory dicta, the court will proceed to inquire whether charities, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, could be established by a court of equity, either exercising its ordinary jurisdiction, or enforcing the prerogative of the King as *parens patriæ*, before the 43d of Elizabeth.

The general principle, that a vague legacy, the object of which is indefinite, cannot be established in a court of equity, is admitted. It follows, that he who contends that charities formed originally an exception to the rule, must prove the proposition. There being no reported cases on the point anterior to the statute ; recourse is had to elementary writers, or to the opinions given by judges of modern times.

No elementary writers sustain this exception as a part of the law of England. It may be considered as a part of the civil code, on which our proceedings in chancery are said to be founded; but that code is not otherwise a part of the law of England than as it has been adopted and incorporated by a long course of decisions. The whole doctrine of the civil law, respecting charities, has certainly not been adopted. For example: by the civil law, a legacy to a charity, if there be a deficiency of assets, does not abate; by the English law, it does abate. It is not, therefore, enough to show that, by the civil law, this legacy would be valid. It is necessary to go farther, and to show, that this principle of the civil law has been en=

1819.

Baptist Association
v.
Hart'sEx'rs.

grafted into the jurisprudence of England, and been transplanted into the United States.

In White v. White,[a] the testator had given a legacy to the Lying-in Hospital which his executor should appoint, and afterwards struck out the name of the executor. The legacy was established, and it was referred to a Master to say to which Lying-in Hospital it should be paid. In giving this opinion, Lord Thurlow said, " the cases have proceeded upon notions adopted from the Roman and civil law, which are very favourable to charities, that legacies given to public uses not ascertained, shall be applied to some proper object."

These expressions apply, perhaps exclusively, to that class of cases in which legacies given to one charity have, since the statute of Elizabeth, been applied to another; or, in which legacies given so vaguely as that the object cannot be precisely defined, have been applied by the crown, or by the Court, acting in behalf of the crown, to some charitable object of the same kind. White v. White was itself a case of that description; and the words " legacies given to public uses not ascertained," " applied to some proper object," seem to justify this construction. If this be correct, the sentiment advanced by Lord Thurlow, would amount to nothing more than that the cases in which this extended construction was given to the statute of Elizabeth proceed upon notions adopted from the Roman and civil law.

But if Lord Thurlow used this language under the

*a* 1 *Bro. Ch. Cas.* 15.

impression that the whole doctrine of the English
Chancery, relative to charities, was derived from the
civil law, it will not be denied that his opinions, even
when not on the very point decided, are entitled to great
respect.    Something like the same idea escaped Lord
Eldon in the case of Moggridge v. Thackwell.[a]    Yet
upon other occasions, different opinions have been ad-
vanced, with an explicitness which supports the idea,
that the Court of Chancery in England does not under-
stand these dicta as they have been understood by the
counsel for the plaintiff.  In the case of Morrice v. The
Bishop of Durham,[b] where the devise was to the Bi-
shop, in trust, to dispose of the residue " to such ob-
jects of benevolence and liberality as he, in his own
discretion, should most approve," the bequest was
determined to be void, and the legacy decreed to the
next of kin.    The Master of the Rolls said, " In this
court, the signification of charity is derived principal-
ly from the statute of Elizabeth.   Those purposes are
considered charitable, which that statute enumerates,
or which, by analogies, are deemed within its spirit and
intendment."    This case afterwards came before the
Chancellor, who affirmed the decree, and said, " I say
with the Master of the Rolls, a case has not yet been
decided, in which the court has executed a charitable
purpose, unless the will contains a description of that
which the law acknowledges to be a charitable pur-
pose, or devotes the property to purposes of charity
in general."[c]

The reference made by the Chancellor to the words
of the Master of the Rolls, whose language he adopts,

a 7 Ves. 36.        b 9 Ves. 399.        c 10 Ves. 540.

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

proves that he uses the term "law" as synonymous with "the statute of Elizabeth."

Afterwards, in the same case, speaking of a devise to charity generally, the Chancellor says, "it is the duty of the trustees, or of the crown, to apply the money to charity, in the sense which the determinations have affixed to the word in this Court: viz. either such charitable purposes as are expressed in the statute, or to purposes analogous to those."

He adds, "charitable purposes, as used in this Court, have been ascribed to many acts described in that statute, and analogous to those, not because they can with propriety be called charitable, but as that denomination is, by the statute, given to all the purposes described."

It has been also said that a devise to a charity generally is good, because the statute of Elizabeth uses that term.

These quotations show that Lord Eldon, whatever may have been the inclination of his mind when he determined the case of Moggridge v. Thackwell, was, on more mature consideration, decidedly of opinion, that the doctrines of the Court of Chancery, peculiar to charities, originated not in the civil law, but in the statute of Elizabeth. This opinion is entitled to the more respect, because it was given after an idea, which might be supposed to conflict with it, had been insinuated by Lord Thurlow, and in some degree followed by himself; it was given in a case which required an investigation of the question; it was given, too, without any allusion to the dicta uttered by Lord Thurlow and himself; a circumstance which would

scarcely have occurred, had he understood those dicta as advancing opinions he was then denying. It is the more to be respected, because it is sustained by all the decisions which took place, and all the opinions expressed by the judges soon after the passing of the statute of Elizabeth. In 1 *Ch. Cas.* 134. a devise to the Parish of Great Creaton, the Parish not being a corporation, was held to be void independent of the statute, but good under it. So, in the same book, p. 267. on a devise to a corporation which was misnamed, the Lord Keeper decreed the charity under the statute, though before the statute no such devise could have been sustained. The same point is decreed in the same book, p. 195. and in many other of the early cases. These decisions are totally incompatible with the idea that the principles on which they turned were derived from the civil law.

There can be no doubt that the power of the crown to superintend and enforce charities existed in very early times; and there is much difficulty in marking the extent of this branch of the royal prerogative before the statute. That it is a branch of the prerogative, and not a part of the ordinary power of the Chancellor, is sufficiently certain. *Blackstone*, in v. 3. p. 47. closes a long enumeration of the extraordinary powers of the Chancellor, with saying, "He is the general guardian of all infants, idiots, lunatics; and has the general superintendance of all charitable uses in the kingdom; and all this over and above the vast and extensive jurisdiction which he exercises in his judicial capacity in the Court of Chancery." In the same volume, p. 487. he says, "the king, as *parens*

1819.

Baptist Association
v.
Hart'sEx'rs.

*patriæ*, has the general superintendance of all chari- ties, which he exercises by the keeper of his con- science, the Chancellor; and, therefore, whenever it is necessary, the attorney general, at the relation of some informant, files, *ex officio*, an information in the Court of Chancery, to have the charity properly establish- ed."

The author of " A Treatise of Equity" says, " so, anciently in this realm, there were several things that belonged to the king as *parens patriæ*, and fell under the care and direction of this Court: as, charities, infants, idiots, lunatics, &c." *Cooper*, in his chapter on the jurisdiction of the Court, says, " the jurisdic- tion, however, in the three cases of infants, idiots or lunatics, and charities, does not belong to the Court of Chancery as a court of equity, but as administer- ing the prerogative and duties of the crown."[a]

It would be waste of time to multiply authorities to this point, because the principle is familiar to the profession. It is impossible to look into the subject, without perceiving and admitting it. Its extent may be less obvious.

We now find this prerogative employed in enfor- cing donations to charitable uses, which would not be valid if made to other uses; in applying them to dif- ferent objects than those designated by the donor; and in supplying all defects in the instrument by which the donation is conveyed, or in that by which it is administered.

It is not to be admitted that legacies not valid in themselves, can be made so by force of prerogative,

[a] *Cooper's Eq. Pl.* 27.

in violation of private rights. This superintending
power of the crown, therefore, over charities, must be
confined to those which are valid in law. If, before
the statute of Elizabeth, legacies like that under consi-
deration would have been established, on information
filed in the name of the Attorney General, it would
furnish a strong argument for the opinion, that some
principle was recognised prior to that statute, which
gave validity to such legacies.

But although we find *dicta* of Judges, asserting,
that it was usual before the statute of Elizabeth, to
establish charities, by means of an information filed
by the Attorney General; we find no *dictum*, that
charities could be established on such information,
where the conveyance was defective, or the dona-
tion was so vaguely expressed, that the donee, if not
a charity, would be incapable of taking; and the
thing given would vest in the heir or next of kin.
All the cases which have been cited, where charities
have been established, under the statute, that were
deemed invalid independent of it, contradict this
position.

In construing that statute, in a preceding part of
this opinion, it was shown, that its enactments are
sufficient to establish charities not previously valid.
It affords, then, a broad foundation for the superstruc-
ture which has been erected on it. And, although
many of the cases go, perhaps, too far; yet, on a re-
view of the authorities, we think they are to be con-
sidered as constructions of the statute not entirely to
be justified, rather than as proving the existence of
some other principle concealed in a dark and remote

1819.

Baptist As-
sociation
v.
Hart'sEx'rs.

But even if,
in England, a
charitable be-
quest of this
nature could
be enforced by
virtue of the
king's prerog-
ative as *parens*
*patriæ, Quære*,
how far this
principle is ap-
plicable in the
courts of the
United States?

antiquity, and giving a rule in cases of charity which forms an exception to the general principles of our law.

But even if in England the power of the king as *parens patriæ* would, independent of the statute, extend to a case of this description, the inquiry would still remain how far this principle would govern in the courts of the United States. Into this inquiry, however, it is unnecessary to enter, because it can arise only where the Attorney-General is made a party.

The Court has taken, perhaps, a more extensive view of this subject, than the particular case, and the question propounded on it, might be thought to require. Those who are to take this legacy beneficially, are not before the Court, unless they are represented by the surviving members of the Baptist Association, or by the present corporation. It was, perhaps, sufficient to show, that they are not represented by either. This being the case, it may be impossible that a party plaintiff can be made to sue the executor, otherwise than on the information of the Attorney General. No person exists who can assert any interest in himself. The *cestui que trust* can be brought into being only by the selection of those who are named in the will to take the legacy in trust, and those who are so named, are incapable of taking it. It is, perhaps, decisive of the question propounded to this Court to say, that the plaintiffs cannot take. But the rights of those who claim the beneficial interest, have been argued at great length, and with great ability ; and there would have

been some difficulty in explaining satisfactorily, the reasons why the plaintiffs cannot take, without discussing also, the rights of those for whom they claim. The Court has, therefore, indicated its opinion on the whole case, as argued and understood at the bar.

1819.

Baptist Association
v.
Hart'sEx'rs.

CERTIFICATE. This cause came on to be heard on the transcript of the record of the Court of the United States, for the Fifth Circuit, and the District of Virginia, and on the question therein stated, on which the Judges of that Court were divided in opinion, and which was adjourned to this Court, and was argued by counsel: On consideration whereof, this Court is of opinion, that the plaintiffs are incapable of taking the legacy for which this suit was instituted; which opinion is ordered to be certified to the said Circuit Court.[a]

a *Vide* APPENDIX, *Note* I. *on Charitable Bequests.*