## John Manning *et al. versus* The Inhabitants of the Fifth Parish in Gloucester.

Some of the inhabitants of a parish in the town of G. being universalists and members of an independent society in another part of the town, it was voted, at a parish meeting in 1802, that the independent society build a meetinghouse, according to their town valuation, with the parish, and use it in the same proportion. The house was built accordingly, and the societies apportioned the time in which each should occupy it ; and for two years it was occupied agreeably to such apportionment ; afterwards the independent society were excluded. The house was built on land granted by the commoners of the town in 1724, " to P, T and B, and the rest of the neighborhood, &c. for the use of a school for ever;" and this land was for more than 40 years in the exclusive possession of the parish. An instrument, signed and sealed by the members of the independent society who had joined in building the meetinghouse, containing the terms of the agreement, as the plaintiffs alleged, and which they said had been accepted by a vote of the parish in 1802, was offered to the parish in 1805 for their acceptance, but was rejected In 1821 the plaintiffs, (two only of whom were subscribers to the written agreement,) with other persons, formed themselves into a separate universalist society. Upon a bill in equity against the parish to compel them to perform the written agreement, it was *held ; —*

That parol evidence was inadmissible, to prove that this agreement had been acceded to by the parish, no vote to that effect appearing on the parish records : —

That the suit could not be sustained by the plaintiffs for the benefit of themselves and others of the universalist society, as it did not appear that they were successors or legal representatives of the independent society, nor for the benefit of the plaintiffs as subscribers of the agreement, as all of them were not subscribers : —

That if the agreement were considered as an executory contract not involving a trust, a specific performance could not be decreed under *St.* 1817, *c.* 87, as the contract was made before the passing of the statute ; and if considered as involving a trust, the trust did not arise under a deed, the vote of the parish not being a deed, nor equivalent to a deed, and so was not within the equity jurisdiction given by that statute to this Court in regard to trusts : —

That if the grant of the commoners was by a deed of trust, the trust could not be enforced under this bill, in which the trust set forth was not alleged to spring from that grant : —

That if the persons named in the grant took jointly or in common with those in the neighborhood, the plaintiffs, upon showing a title under the grant, would hold in common with individuals, and not with the parish in its corporate capacity : —

And that the parties were not tenants in common of the meetinghouse, because it was built at their joint expense and for their common benefit, but that 't belonged to the parish alone, they having the title to the land.

THIS was a bill in equity brought by John Manning, Aaron Pool and William Norwood, all of Gloucester, on behalf of themselves and of all others, being inhabitants of Sandy Bay (part of Gloucester) and belonging to the religious society of universalists, otherwise heretofore called members of the Independent Society in Gloucester, and parties to the covenant hereafter mentioned, and their heirs. The bill alleges, that heretofore, as set forth in the covenant, purporting to be dated on the 20th of August, 1802, the plaintiffs, having been requested by the inhabitants of the fifth parish to join them in building a house for public worship, presented the covenant to a meeting, called an *inhabitants' meeting*, held by the fifth parish and others, inhabitants of Sandy Bay, being the plaintiffs in this suit, convened by the authority of the fifth parish, and that the covenant was accepted by the parish ; that the plaintiffs did by the covenant, under their seals, covenant and agree with the inhabitants of the parish, that they would bind themselves and their heirs for the building and finishing of the meetinghouse, in concurrence with the inhabitants of the parish, in manner following, *viz.* that after the sales of the pews, if the proceeds should be insufficient to defray the expense of building, they would pay their proportion of the deficiency, to be ascertained by the town valuation of 1803, by a joint committee to be appointed by the parties for that purpose, or if there should be a surplus, that it should be distributed between the parties in the like proportion ; and that the meetinghouse should be used by the parties respectively in the same proportion, to be ascertained by a joint committee of both societies ; and that upon the proportion's being ascertained to the acceptance of a majority of their committee or committees respectively, it should thereupon be accepted by the inhabitants, and such proportion should be recorded on their parish book, and should be mutually binding on both parties ; that such apportionment should continue in force for seven years, and at the end of every seven years there should be chosen a joint committee of the parties to determine the proportion anew, according to the town valuation of every seventh year ; and that every new appointment should be binding on the parties for seven years, the committee having first noted

Manning *v.* Fifth Par. in Glouceste.

their doings in writing and delivered a copy to each of the parties. The plaintiffs further aver, that this covenant was adopted by the parish, and that in pursuance of the provisions therein contained, the plaintiffs and the parish built the meetinghouse, and thereupon became owners and tenants in common of the same, and by themselves and their pastors occupied the same alternately, from the time of the dedication thereof on the 12th of September, 1804, for the space of two years ; that on the 3d of January, 1805, pursuant to the covenant, a joint committee was chosen, who made an apportionment, such as to give to the parish the use of the meetinghouse for thirty-one Sundays in a year and to the plaintiffs twenty-one, and this apportionment was noted in writing by the committee and a copy delivered by them to the plaintiffs, and another copy to the defendants, to be accepted and recorded in their parish book ; that pursuant to this apportionment, the plaintiffs used the meetinghouse until the 9th of February, 1807, when they were debarred the use of it by the parish ; that at that time there was in the hands of their common treasurer for building the meetinghouse, the sum of 1600 dollars, which, together with the proceeds of the sale of 14 pews then remaining unsold, the parish have since taken, without accounting to the plaintiffs for their proportion thereof. The plaintiffs further aver, that in 1811 they appointed a committee to meet any committee that might be chosen by the parish, for the purpose of apportioning the meetinghouse, and that the committee made application to the parish to be permitted to use the meetinghouse pursuant to the covenant and agreement before mentioned ; that the application was renewed in 1821 ; and that in 1824 they made application for the same purpose, and also for their proportion of the surplus money above mentioned, and for compensation for being debarred the use of the meetinghouse ; all which the parish refused. The plaintiffs pray for a decree of specific performance of the agreemen between the parties. They also allege, that the defendants, by their doings, have made themselves trustees in the premises to the use and benefit of the plaintiffs jointly with themselves in the proportion stated, and pray for a performance of the trust.

The defendants answer, that they did not enter into such covenants and agreements with the plaintiffs, then members of the Independent Society, as are set forth in the bill ; that the supposed covenant and agreement, alleged by the plaintiffs to have been signed and sealed on their part, was not delivered to the defendants, and was not accepted by them, and was not recorded on the parish records ; that the plaintiffs and defendants did not build the meetinghouse and thereupon become owners and tenants in common thereof, and did not use the same in common alternately for two years, as alleged ; that no apportionment of the meetinghouse was made by a joint committee for that purpose duly chosen and authorized ; that they are not bound to account to the plaintiffs for the proceeds of the pews, but they say that the whole proceeds have long since been applied for the payment of the expense of building and completing the meetinghouse ; that they did not grant the separate use of the meetinghouse to the plaintiffs upon their several applications, nor appoint committees to apportion the same, because the meetinghouse was built upon land of the parish, and has always belonged to the parish, and the plaintiffs have had no right or interest therein, except what belonged to such of them as owned pews ; that they have never been trustees in the premises, for the use and benefit of the plaintiffs in any manner ; that the supposed covenant and agreement purports to have been executed by thirty-six persons, (who are named, including two only of the three plaintiffs,) and that after the date thereof and before this suit was commenced, thirteen of them (naming them) became members of the parish by joining the religious society thereof, five of them (naming them) removed from the bounds of the parish, and sixteen of them (naming them) died ; that it was provided by the supposed covenant and agreement, that the persons who signed and sealed it should meet together annually for the choice of certain officers and the transaction of other business, and that such meetings have not been held ; that those persons did not become a separate religious society for the support of public worship, but continued to be members of the Independent Society ; and that if the plaintiffs ever had any cause of com-

*Manning
v.
Fifth Par. in
Gloucester*

plaint against the defendants, it is barred by the statute of Limitations.

It was agreed by the parties, that all the inhabitants of the territory of the fifth parish, otherwise called *Sandy Bay, the cape,* and *the head of the cape,* were formerly members of the first parish in Gloucester, and that on the 1st of January, 1754, they were incorporated as a distinct parish. Before their incorporation, to wit, in 1752, they voted to build a meetinghouse, and they accordingly did build one. It was taken down and sold in 1804, and the proceeds distributed among the several owners of the pews. Ebenezer Cleaveland was ordained minister of the parish in 1755, and on his own request was dismissed in 1779. From that time there was no settled minister in Sandy Bay, until October, 1805, when the present minister of the parish was ordained.

From 1774 there has been in Gloucester a society of universalists. It was known by the name of the Universalist Independent Society, and was incorporated June 28, 1792, by the name of the Independent Christian Church. In 1788 divers inhabitants of the fifth parish had joined themselves to this society. These members met occasionally, as they had preaching, at the old meetinghouse, and elsewhere within the fifth parish. The others of their denomination used to meet at the *harbor,* so called, in the first parish, five miles from the old meetinghouse. The society had there a meetinghouse, owned by individuals, and a settled minister.

There were no other denominations of christians in Sandy Bay, until 1805. After that time there were baptists ; who were incorporated in 1811.

From 1787 the warrants for meetings are recorded, " to the freeholders and all qualified voters of the fifth parish."

At a meeting March 25, 1788, it was voted to repair the meetinghouse, the parish committee to attend to the business of repairing. It was also voted, that the Independent Society have the meetinghouse every fourth Lord's day the current year for their use, by paying one fourth part of the costs of reparation. A vote similar to this last was passed in April, 1792, and in June following it was voted, " that the Independent Society have the meetinghouse one fourth part of the

time to preach in, as long as they shall repair one quarter part."

The inhabitants of the territory of the fifth parish, from their incorporation in 1754 until the building of the new meetinghouse in 1804, acted in the name of the fifth parish in or of Sandy Bay, as a school district, and managed their school concerns by the parish officers until 1787. Then they divided themselves into three wards for that year, and chose a committee of two for each ward, without regard to religious denominations. In 1790, at a meeting respecting schools, a member of the universalist society was chosen moderator; and in 1792, two of that society were added to the parish committee to regulate schools and lay out the money. In 1796 it was voted to build a schoolhouse " on the parish land." The expression in the warrant is, " the land that belongs to the parish for that purpose." It was also voted, that the parish committee, with four other persons (three of whom were universalists), should be a committee for building the schoolhouse. These votes, however, were not carried into effect. In 1797 it was voted, that any number of persons should have liberty to build a proprietors' schoolhouse on the parish land; and that the school committee, with the parish committee, lay out a convenient lot for the same. This school committee consisted partly of universalists. The committee set off a part of the land to the proprietors of the new schoolhouse; which was built in shares by individuals of both societies.

The remaining part of the land above mentioned, on which the new meetinghouse was afterwards built, was the remaining front of an acre of land granted by the commoners of Gloucester, January 26, 1725, " to John Pool, John Tarr, Jabez Barker, and the rest of the neighborhood at the head of the cape, for the use of a school for ever," &c. This grant and the location, and the gift, in 1765, of the reversion, in case of a forfeiture, to Rev. E. Cleaveland, are all that is to be found in the records of the commoners respecting this land. It appears by the parish records, that in 1780 it was voted, that the parish committee take care of the school land. In subsequent years there were votes requiring the parish committee to lease the land, fence it, &c. In 1807 it was voted,

12

that the Rev. Mr. Jewett have the improvement of the parish land for the current year. A similar vote was passed every year until 1813, when it was voted, that he "should have the improvement of the parish land so long as he continues to supply the desk in this house."

At a meeting of the fifth parish, April 26, 1802, it was voted "to build a meetinghouse the current year." A committee of five, two of whom were universalists, was chosen to build the meetinghouse. It was also voted that the committee warn all the inhabitants to meet at the adjournment.

Pursuant to the above vote a warrant was issued, to warn "the freeholders and other inhabitants of both societies in the fifth parish." A meeting was held May 11, 1802, when it was voted "to record the word *inhabitants* for the word *parish* that is used in the warrant;" and "that the inhabitants will build the meetinghouse on the land belonging to the inhabitants, adjoining to the new schoolhouse land in Sandy Bay." The meeting was adjourned to May 25, when it was voted, "that the Independent Society build the new meetinghouse according to their town valuation, with the other society called the fifth parish in Gloucester;" — "to build and improve the house according to the town valuation;" — "to take the valuation by the town valuation and in the year 1803." The building committee were directed to proceed in the execution of the work. They purchased materials in 1802, 1803, &c. and hired money on their own credit, and built and completed the house.

On the 4th of July, 1804, pursuant to a warrant issued by the parish committee, to warn "the freeholders and other inhabitants of both societies in Sandy Bay," a meeting was held, at which a committee of five (who were members of both societies) was chosen to appraise the pews before the time of sale. It was voted, "that the pews be set up at the appraisal and struck off to him who shall offer the most money above the appraisal, being an inhabitant of Sandy Bay." Three persons, two of them universalists, were chosen a committee to sell the pews and give conveyances of the same. At an adjourned meeting, July 9th, F. Norwood jun. was chosen treasurer to receive the moneys arising from the sale of pews.

The 19th of July was appointed for the sale. The sum of the appraisals was 8871 dollars, the estimated cost of the house. The amount received by the treasurer for the pews sold was 9009 dollars. Of 121 pews sold in 1804, 50 were bought by universalists. In 1807 the defendants sold the rest of the pews (16 in number), appraised at 1135 dollars in the whole, at a small advance above the appraisal. The bell and clock now in the meetinghouse were purchased by the defendants with part of the money thence received.

On the 1st of February, 1805, a warrant was issued to warn the freeholders and other inhabitants of the fifth parish qualified to vote in town meetings, " first, to see if said parish will accept *in toto* a certain instrument containing articles of agreements entered into by certain individuals of the Christian Independent Society, relative to their building and improving the new meetinghouse with said parish, and record the same on the parish book. Secondly, to know if said parish will accept the report of the joint committees of the fifth parish and of the proprietors of the Independent Christian Society, in which they have agreed on the proportion of time each society is entitled to improve respectively the new meetinghouse." On the 18th of February the parish voted not to accept of this instrument, nor of the report of this joint committee.

At a parish meeting, March 7, 1805, it was voted, " that the parish committee agree with the committee of the Independent Society, and know how each society is to improve their proportion of time, and make report at the adjournment." The record of the adjourned meeting, March 25, states, " that the committee did not make any return of their doings as respects the Independent Society." On the 17th of March, 1806, the parish voted, " that the parish committee notify the committee of the Independent Society to meet with them, and at such meeting of the two committees said parish committee allow said Independent Society to improve the meetinghouse in proportion to what said society owns in said house, the current year." The committees had a conference, and the universalists rejected the proposition.

On the 5th of February, 1807, the parish voted, " that the

Manning
*v.*
Fifth Par. in
Gloucester

parish committee keep the keys of the meetinghouse in their possession, and not deliver them to any person or persons whatever, nor open the house unless it be for public worship, or to transact parish concerns in;" and the parish officers have governed themselves by that vote to the present time.

The new meetinghouse was dedicated in September, 1804, and for about two years was used two Sundays in five by members of the Christian Independent Society. There was no settled minister at Sandy Bay in 1802 and 1803, and a universalist minister has never been settled there.

The universalists appointed committees for apportioning the meetinghouse, and made demands for the use of it, as stated in the bill.

Since the year 1803 some inhabitants of the parish have joined or returned to the universalist society in Gloucester, others have become members of the baptist society, and some universalists have returned to the parish society.

The parish committees called the parish meetings and the inhabitants' meetings respecting the meetinghouse, &c. after the first meeting in 1802, which was called on a justice's warrant. The records of all the meetings before referred to were made by the parish clerk.

The support of public worship in Gloucester has been by taxes on polls and estates, or voluntary ; never by assessments on the pews, or shares in the houses of public worship.

The universalists who were proprietors of the meetinghouse, have held meetings as set forth in their records, beginning February 17, 1804, but the defendants objected that these records were not admissible in evidence. It appeared from them, that such universalists met at different times from February 17, 1804, to February 25, 1811, (once, in 1805, in the meetinghouse,) and took measures for procuring an apportionment of the meetinghouse.

On the 26th of February, 1821, a number of persons met at the house of Manning (one of the plaintiffs), for the purpose of forming a religious society, and chose a committee to draft a constitution. They met by adjournment on the 2d of March, when the constitution was reported and accepted, and again on the 9th of March, when they chose a clerk, treasu-

rer, and committee ; also a committee to give notice to the
Christian Independent Society in Gloucester of the establish-
ment of the Universalist Benevolent Society, and to request
the Christian Independent Society to discharge Aaron Poole
and others.   They have met every year since, and chosen
officers for the year.   In the constitution they recite, "that
being in part the remainder of that portion of the Christian
Independent Society of Gloucester, who heretofore, in the
year 1802, formed ourselves into a body, by joining as pro
prietors toward building a house of public worship, &c. with
and by the request of the fifth parish, &c. and other members
who have since joined us, considering the distance we are
from said Christian Independent Society's meetinghouse at the
harbour, so called, and presuming on the free consent of the
said society that we should separate therefrom and become a
society of ourselves, — and in order to improve what property
we may have in common with said fifth parish in said meeting-
house in Sandy Bay, and other conveniences and appurtenan-
ces there, — we do hereby engage to conform to such rules,"
&c.

The cause was argued by *Pickering* and *Manning*, for the
plaintiffs, and *Saltonstall* and *Cummins*, for the defendants.

*Manning* offered depositions to show that the covenant in
question was prepared previously to the meeting of May 25,
1802, and was the foundation of the votes then passed.

*Saltonstall* said, that if the covenant had been then offered
and accepted by the parish, it would have appeared on their
records, and parol evidence to supply or contradict the records
was inadmissible.

*Pickering* replied, that the question was not between corpo-
rators themselves ; the plaintiffs are strangers.   The defend-
ants are trustees, and their records cannot be conclusive against
the *cestui que trusts*.   He cited *Canal Bridge* v. *Gordon*, 1
Pick 304 ; [see 2nd ed. note 1 ;] *Bangs* v. *Snow*, 1 Mass
R. 181

*Per Curiam*.   We think that in a suit of this kind, a defi-
ciency in the parish records is not to be supplied by the testi-
mony of the inhabitants.   *Taylor* v. *Henry*, 2 Pick. 402.
If a vote is omitted, the application should be for process to

Manning
*v.*
Fifth Par. in
Gloucester

*Nov. 6th.*

16

*Nov. 7th*

compel the clerk to amend his records.[1]  This is our present opinion ; but we can revise it, should it become necessary.

An argument was then had upon the case as it stood without these depositions.

WILDE J. delivered the opinion of the Court.  This case, although incumbered with many facts, depends principally on the covenant or agreement set out in the bill, and the proceedings ·of the defendants in relation to that agreement.

It is alleged in the bill, that in the year 1802 an agreemen was entered into between the defendants and divers inhabitants of Sandy Bay, who were then members of a society called the Independent Society of Gloucester, for the purpose of erecting a house for public worship, to be held and used by them as tenants in common, for their mutual convenience and benefit, according to the terms of the agreement, which are particularly set forth in the bill.  The defendants deny that they ever became a party to this agreement ; and it appears, that at a legal meeting of the inhabitants of the parish on the 18th day of February, 1805, the same was rejected by a vote of the parish.  But the plaintiffs contend, that the parish was .bound by their previous acts and votes, and consequently that the vote of February 1805 was inoperative.*

The agreement bears date the 20th of August, 1802, and was probably signed about that time.  At a previous parish meeting, held on the 25th of May, 1802, it was voted, that the Independent Society build the new meetinghouse according to their town valuation, with the other society called the Fifth Parish of Gloucester.  It was also voted to build and improve the house according to the town valuation.  The meetinghouse was accordingly built and completed in the year following, and the pews were disposed of, in pursuance of a vote of the parish, among the subscribers of the agreement, and the other members of the two societies.  Committees also were appointed by those societies to apportion the time in which each should use and occupy the meetinghouse, according to the stipulations contained in the agreement.  And for two years

---

[1] See *Hartwell* v. *Littleton,* 13 Pick. 229.

On this point the counsel for the plaintiffs cited *Rehoboth* v. *Hunt,* 1 Pick 225.  *Reporter*

the house was occupied according to the apportionment made by the committees.

The plaintiffs contend, that these votes and proceedings of the parish amount in law to an acceptance of the agreement.

So far as the terms of the agreement and the votes of the parish coincide, the parish is certainly bound, and thus far the plaintiffs are entitled to relief, provided the Court has jurisdiction of the case, and the present parties are the parties to the original contract, or their legal representatives.*

The plaintiffs claim in behalf of themselves and the other members of the Universalist Benevolent Society, so called, but it does not appear that they are the successors or legal representatives of the Independent Society for whose benefit the contract was made. The bill therefore cannot be sustained for the benefit of the Universalist Benevolent Society. Nor can the plaintiffs maintain their suit as subscribers to the agreement, because some of them are not subscribers, and have no interest in the contract. But as these objections may be removed by amending the bill, or by filing a new one, it seems proper that we should decide the question of jurisdiction, so as to prevent, as far as may be, further controversy.

If we consider the agreement as an executory contract not involving a trust, it is clear that we have no authority to decree a specific performance. The statute of 1817, *c.* 87, expressly limits the jurisdiction of the Court to contracts made subsequently to the passing of the act. And if the agreement might be considered as involving a trust to be performed by the defendants, still it was a trust arising under a parol contract, and not under a deed, and so is not within the equity jurisdiction of the Court.†[1] The vote of the parish is neither a deed nor equivalent to a deed ; nor does it appear that the grant from

---

* To show that the plaintiffs were proper parties, their counsel cited *Lloyd* v. *Loaring*, 6 Ves. jun. 773; *Cockburn* v. *Thompson*, 16 Ves. jun. 321; *Scots Char. Soc.* v. *Shaw*, 8 Mass. R. 532. — For the defendants was cited *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1. *Reporter.*

† On this point the counsel for the defendants cited *Goodwin* v. *Hubbard*, 15 Mass. R. 217; *Runey* v. *Edmands*, ibid. 294; *Flint* v. *Sheldon*, 13 Mass. R. 443. *Reporter.*

[1] See *Smith* v. *Lane*, 3 Pick. (2nd ed.) 207, note 1.

2 *

Manning
v.
Fifth Par. in
Gloucester.
the commoners of Gloucester was by deed. If however it were by a deed of trust, the trust could not be enforced against the defendants, who are not the trustees, and do not hold the estate under that grant. It is true that all persons coming into possession of a trust estate, with notice of the trust, are bound to perform the trust.[2] But as this bill is framed, no such question can be raised. The trust, as set forth in the bill, is alleged to spring from the agreement between the subscribers and the parish. If any trust had been created by the grant of the commoners of Gloucester, the trust should be set out in the bill, with suitable averments ; and then the questions might arise, whether the grant were by deed, within the meaning of the statute of 1817 ; whether the parish had notice of the trust ; and other questions which it is unnecessary to particularize. At present, nothing appears in the facts stated which can give us jurisdiction under the statute of 1817.

The remaining question to be considered is, whether we have jurisdiction under the statute of 1823, c. 140, which provides that this Court may hear and determine in equity all disputes between co-partners, joint-tenants, and tenants in common. * The plaintiffs' counsel contend that the parties are tenants in common of the meetinghouse, but from the facts admitted the title to the land on which it was erected appears to be in the parish. It is agreed that for more than forty years the parish has been in the open, exclusive, and undisturbed possession of the lot in question, which possession alone is a sufficient title.

But if we look into the original title, we find it equally clear that the parties are not tenants in common. The grant of the commoners of Gloucester in 1724, was to " John Pool, John Tarr, Jabez Barker, and the rest of the neighbourhood at the head of the cape, for the use of a school for ever."

If under this grant the persons named took an estate in trust for the use of the neighbourhood, as the plaintiffs' counsel

---

[2] See 2 Story's Comm. Eq. 502, 503 ; 1 Story's Comm. Eq. 384 ; *Safford* v. *Rantoul*, 12 Pick. 233.

* The defendants' counsel cited *Wilkin* v. *Wilkin*, 1 Johns. Ch. R. 111 ; *Phelps* v. *Green*, 3 Johns. Ch. R. 302 ; *Donovan* v. *Finn*, 1 Hopk 59 ; *Walton* v. *Law*, 6 Ves. jun. 150.  *Reporter.*

have argued, then the parish in its corporate capacity has no title under the grant, either legal or equitable. The trustees took the legal estate, and the other inhabitants of the neighbourhood were the *cestui que trusts*. And if the persons named in the grant took jointly or in common with the inhabitants not named, the parties do not hold the estate in common, for the plaintiffs have shown no title under the grantees; and if they had, they would hold in common with other individuals, and not with the parish.

But the plaintiffs' counsel contend, that the parties are tenants in common of the meetinghouse, if not of the land, because it was built at their joint expense, and for their common benefit. But in determining the question, whether the parties are tenants in common, we must look at the legal title, which is clearly in the parish. The portion of the expenses contributed by the subscribers of the agreement and the Independent Society, towards the building of the meetinghouse, gave them no legal title in the property. These expenses were advanced in pursuance of an agreement made, or supposed to be made, with the parish, which however cannot be construed into a grant of any right or title in the building. Nor have the plaintiffs acquired any title by occupation, for this was under a vote of the parish for a limited time, which has long since expired.

The only remedy the plaintiffs have is at law on the contract, or an implied assumpsit for the expenses; and this remedy is still open for them, if not lost by lapse of time.* It may be an inadequate remedy, and no doubt this is a proper case for a court of equity; but without more ample jurisdiction, it is impossible for us to grant relief in equity.[1]

*Bill dismissed with costs.*

---

* In regard to the statute of limitations, the defendants' counsel cited 1 Mad. Ch. Pract 73; 2 Mad. Ch. Pract. 244; *Stackhouse* v. *Barnston,* 10 Ves jun. 466; *Hovenden* v. *Annesley,* 2 Sch. & Lefr. 630. *Reporter.*

[1] See Revised Stat. *c.* 81, § 8