## JOTHAM SEWALL, JR. vs. CHARLES CARGILL.

Where, in 1739, a grant of land was made, " unto the inhabitants now settled
on *Sheepscot River*, at a place called *Newcastle*," which place was then unin-
corporated, to hold unto the " said inhabitants, their heirs and assigns forev-
er, to be and remain in said settlement now called *Newcastle* for a glebe or
parsonage forever"; and where the same place was, in 1753, incorporated as
the town of *Newcastle*, and the inhabitants of the town ever after claimed
and improved the land for parochial purposes, until the town was divided
into several parishes, since which the first parish have claimed and im-
proved; the grant was held to pass the land to the inhabitants of the town
as a gift or dedication to public, pious, and charitable uses.

THE action was trespass, *quare clausum*, brought by the plaintiff,
as *Minister of the first Congregational Church and Parish in
Newcastle*; and was submitted to the decision of the Court on an
agreed statement of facts.  These appear in the opinion of the
Court.

*Mitchell* and *I. G. Reed*, for the plaintiff, contended, that they
had established the following propositions.

1. That the plaintiff has a perfect title under the deed from
*Christopher Toppan.*

2. That they had shown an uninterrupted possession sufficient of
itself, without the deed, to enable them to maintain the action.

3. That the defendant, being a mere trespasser, has no right to
require a title in us.

They cited under the first proposition, *Weston v. Hunt*, 2 *Mass.
R.* 500; *Dillingham* v. *Snow*, 5 *Mass. R.* 555; *First Parish in
Brunswick* v. *Dunning*, 7 *Mass. R.* 445; *Brown* v. *Porter*, 10
*Mass. R.* 93; *Hornbeck* v. *Westbrook*, 9 *Johns. R.* 73; *Jackson*
v. *Cory*, 8 *Johns. R.* 385; *Cincinnati* v. *White*, 6 *Peters*, 432;
*Beaty* v. *Kurtz*, 2 *Peters*, 566; *Pawlet* v. *Clark*, 9 *Cranch*, 292;
*Jarvis* v. *Dean*, 3 *Bingham*, 474; *Shapleigh* v. *Pillsbury*, 1
*Greenl.* 271; *Rice* v. *Osgood*, 9 *Mass. R.* 38.  Under the sec-
ond proposition, they cited *Warren* v. *Childs*, 11 *Mass. R.* 222;
*Little* v. *Megquier*, 2 *Greenl.* 176; *Ken. Pur.* v. *Laboree*, *ib.*
273; *stat.* 1821, *c.* 62.

*Mellen* and *F. Allen*, for the defendant.

The plaintiff must show good title by deed, or the action fails.
Because a title by possession extends only to actual occupation,

*Ken. Pur.* v. *Springer*, 4 *Mass. R.* 416; *Ken. Pur.* v. *Laboree*, 2 *Greenl.* 176. And because a corporation cannot acquire a title by disseizin. *Weston* v. *Hunt*, 2 *Mass. R.* 500.

A deed of bargain and sale by the law of the land, conveys nothing unless to grantees named, or to a corporation, capable of taking; and the object of the grant does not alter the case, as to the question of its legal operation. *Hall* v. *Leonard*, 1 *Pick.* 30; *Paul* v. *Moody*, 7 *Greenl.* 455; 4 *Kent*, 461; *Com. Dig. Capacity*, 1; 2 *Conn. R.* 287. A grant is one thing; a dedication a different one.

The case was continued for advisement, and the opinion of the Court was subsequently prepared by

EMERY J. — This is an action of trespass, for breaking and entering on the 1st of *April*, 1834, and continuing the trespass to the 11th day of *August*, 1836, the date of the plaintiff's writ, on a tract of land in *Newcastle*, the plaintiff's close, containing one hundred acres, describing its boundaries, being the land called and known as the ministerial lot, and cutting down and carrying away a great number of the plaintiff's trees, naming them, of the value of $600, and other enormities to the plaintiff's damage, as he saith, the sum of $1000.

It comes before us on an agreed statement of facts, from which we gather, "that on the 15th day of *May*, 1739, *Christopher Toppan* of *Newbury*, in the county of *Essex*, and Province of the *Massachusetts Bay* in *New-England*, *Clerk*, for and in consideration of good will and affection, by deed of that date, acknowledged in the county of *York*, on the 19th day of *May*, 1739, recorded *June* 21, 1739, gave and granted unto the inhabitants now settled on *Sheepscot River*, at a place called *Newcastle* in the county of *York*, and province aforesaid, their heirs and assigns forever, for the uses hereinafter mentioned two hundred acres of land, situate, lying and being in *Newcastle*, and is the lots No. 15 and 16, which lots is eighty-two rods or poles wide, having the lot No. 14 on the southerly side, which is the land sold by said *Toppan* to *Samuel Kennedy*, fronting westerly on *Dyer's River Marsh*, on the east side, so called, and containing the aforesaid width from said marsh east south-east to the *River* called *Mill River*, also two thirty-sev-

enth parts of all the marsh and meadow lying within the bounds of a tract of land purchased of the *Indians* by *Elizabeth Gint*, as by a deed bearing date, Anno Domini, 1662, and recorded in the old book of *Eastern Records*, reference thereto being had, may more fully appear, of which the premises is a part. To have and to hold the said granted and gifted premises with all the appurtenances, privileges and commodities to the same belonging to the said inhabitants, their heirs and assigns, to be disposed of in manner following, viz. one half of said land and marsh to be disposed of to the first Minister that shall be settled amongst said people at said place, either by ordination or instalment, to him, his heirs and assigns forever, and the other moiety or half to be *and remain in said settlement now called Newcastle for a glebe or parsonage forever,*" with covenants of lawful ownership and seizin in fee, &c.

On the 19th of *June*, 1753, an act was passed for " erecting a place called *Sheepscot* in the county of *York* into a district by the name of *Newcastle,*" because it had been represented to the Court that the inhabitants of *Sheepscot* aforesaid labored under difficulties by reason of their not being incorporated into a district. The bounds of the district were, " beginning at the narrows, called *Sheepscot* narrows, at the upper end of *Wiscasset Bay*, and so extending from said narrows up the said river eight miles, from thence south-east to *Damariscotta River*, and to extend down said river eight miles, and from thence to run to *Sheepscot River* at the place first mentioned ; and the district was by that act invested with all the privileges, powers, and immunities, that towns in this province by law do or may enjoy, that of sending a representative to the general assembly only excepted."

On the 28th of *Oct.* 1773, the town voted to build a meeting-house on the westerly side of this town, on the ministerial lot near the town road. In *March* 14, 1774, it was voted to build a meeting-house on the west side of the town, fifty feet in length, and forty feet in width. An attempt was made in *July* afterward, to . reconsider the vote, but at the meeting for that purpose on the 21st of *July*, 1774, it was put to vote, whether the former vote should be reconsidered, and it passed in the negative. On the 14th of *March*, 1776, voted unanimously, to give *Mr. Thurston Whiting* a call to settle in the gospel ministry in this town. *May* 9th, 1776,

voted, to settle *Mr. Thurston Whiting* on the congregational plat-form, and that be be ordained the second *Wednesday* in *July* next; and *June* 24, 1776, voted, that *Mr. Thurston Whiting* be ordained in *Mr. Samuel Nichol's* barn. On the 7th of *March*, 1782, voted to dismiss him according to the result of council.

It further appears, that as early as *March* 18, 1783, Captain *Robert Hodge* had cut a number of oak trees on the ministerial lot and " on the 7th of *April*, 1783, the town voted, that Captain *Robert Hodge* be acquitted for his cutting a number of oak trees on the ministerial lot, him paying the cost of running out the lines of said lot, which is the sum of £2, 5s. and the charge of entertain-ing the men employed in said business." On the 19th of *Dec.* 1786, an article was inserted in the warrant for the town meeting to see what method the town will take to prevent the timber from being cut from off the ministerial lot of land; and on the 2d of *January*, 1787, the town voted, that Col. *James Cargill* be author-ized to take care of the ministerial lot with power to prosecute any person or persons who have cut any timber on said lot during the last year past from this time, and all that may be cut on said lot in one year next to come, and that he be accountable to the town for all the money he shall receive for said timber. On the 19th of *Dec.* 1795, it was proposed in the warrant to see if the town will sell all or a part of the oak and pine lumber which is on the minis-terial lot so called, to the person who will give most for the same, and to see what the town will do about the lumber that has been cut on the ministerial lot. On the 1st of *Jan.* 1796, they voted not to sell the timber, and appointed a committee of three to pros-ecute all those who have committed trespasses on the lot to final judgment and execution. On the 10th of *May*, 1797, they voted to give *Mr. Kiah Bailey* a call to settle in the gospel ministry in this town, with £100 per year salary, and £100 for settlement. On the 3d of *Oct.* 1797, *Mr. Bailey* was ordained.

From the deposition of *Mr. Bailey* it appears, that he continued pastor of the congregational church and society in *Newcastle*, until the fall of 1823, when he was dismissed; that the town voted to give him a salary of £100 a year, and the use of the parsonage or ministerial lot situated on *Dyer's River*, old *Sheepscot*, and a little south of Capt. *Chase's* house, now deceased, and had a piece of

salt marsh attached to it; that he took possession of the parsonage soon after his settlement, and employed two men, naming them, to cut and haul off the lumber in the winter of 1797–8; that he cut the grass by one of those two men, and others, from year to year, and cut the wood and lumber without molestation; that *Thomas Kennedy* and *William Chase* improved the lot a portion of the time, and paid *Mr. Bailey* a certain sum for the grass and pasture the year he was dismissed. That after his contract with the town was closed he continued in possession of the lot until he was dismissed from the church and society as their pastor. That a colored man, *Charles*, he thought he was called, came to him and requested to build a house on said land, and *Mr. Bailey* gave him liberty to do it, and also to pick up such wood as was down for his own use, but he was not to cut down any standing trees; that the colored man did build a house on the land, and lived on the premises a number of years, and his family were there, the witness believed, when he left the town in 1824; and that the witness had the open, free, and as far as he knew, the exclusive possession of said parsonage upland and marsh until he was dismissed, and that no one to his knowledge claimed or received any portion of the rents paid for said lands until he left the town, in 1824, except himself. Subsequently to the departure of *Mr. Bailey*, in 1824, the ministerial lot was let by the town to *Mr. Townsend*, for $26,50. In 1825, the amount obtained for the use of it, was voted to be paid to the *Rev. Mr. Sewall*, and that he preach out that amount on the west side of the town. In 1826, voted, that the note obtained for the use of the ministerial lot be given up to the congregational society in this town. In 1827, the use of the lot was sold to *William Chase*, at $19,50; and voted to choose an agent to run and settle the line of said lot and marsh thereunto belonging, the expense of which to be one half by the town, and the other half by the owner of the land adjoining; and *Eben'r D. Robinson* was chosen agent for that purpose, and it was regularly let out down to 1831 inclusively, as appears by town records.

The alleged trespass was committed on the south-east part of said close which is woodland, and has never been enclosed by fences.

A meeting-house was once erected on said land by said town, but was abandoned.

On the 16th of *Sept.* 1778, the *Rev. Thurston Whiting*, by his deed of that date, acknowledged the same day, and recorded *May* 24, 1779, conveyed the lot of 100 acres, more or less, bounded northerly by the ministerial lot, so called, in said *Newcastle*, to *Robert Hodge.*

The *Rev. Jotham Sewall*, the present plaintiff, was settled in 1825.

It is contended, by the defendant, that the deed of *Christopher Toppan* to the inhabitants now settled on *Sheepscot River*, at a place called *Newcastle*, &c., is void for uncertainty as to grantees. That a corporation cannot acquire a freehold by disseizin committed by itself. That the plaintiff relying on being a settled minister, and the cutting being on land not fenced, the plaintiff had no possession to give seizin independent of title.

That there is no evidence that *Christopher Toppan* had any interest in the land or possession of it. That a grant is not a dedication.

And that on no fact now before the Court, can this action be sustained, for want of possession and for want of title. That a deed of bargain and sale, by the law of the land conveys nothing unless to grantees named or to a corporation capable of taking; and that the object of the grant, does not alter the law, as to the question of its legal operation.

In the case, *City of Cincinnati* v. *The Lessee of White*, 6 *Peters*, 432, it is said, that dedications of land for public purposes, have frequently come under the consideration of the Court, and the objections which have generally been raised against their validity have been the want of a grantee competent to take the title, applying to them the rule which prevails in private grants, that there must be a grantee as well as a grantor. But that is not the light in which the Court has considered such dedications for public use. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor; and secure to the public the benefit held out, and expected to be derived from and enjoyed by the dedication.

In *Potter* v. *Chapin*, 6 *Paige's Ch. Rep.* 649, it is said, that the decision in the case of the *Baptist Association* v. *Hart's Executors*, 4 *Wheat.* 1, the chancellor said, he believed it is generally admitted, that the decision in that case was wrong. By that decision some doubt was thrown upon the question of charitable donations, for the benefit of a community or body not incorporated so as to be capable of taking and conveying the legal title to property. But the chancellor observes, that it may now be considered as an established principle of *American* law, that the court of chancery will sustain and protect such a gift, bequest or dedication of property to public or charitable uses, provided the same is consistent with local laws and public policy, where the object of the gift or dedication is specific, and capable of being carried into effect, according to the intention of the donor ; and he cites 2 *Kent's Com.* 286; 4 *idem*, 508; 2 *Peters' U. S. Rep.* 566; 3 *Peters*, 99; 7 *Vermont Rep.* 241.

We are not aware that any principle of local law will prevent the passing of this estate for a glebe or parsonage to the inhabitants at *Newcastle*, incorporated subsequently to the grant. We have heard no complaint for nearly a century from *Christopher Toppan* or his heirs, that the corporation of *Newcastle* had committed any disseizin, or that they had failed to appropriate the land according to the intent of the donor. The town has taken and held it in their parochial character, and as soon as the minister was ordained in 1776, he held it in right of the parish. After his connexion with the parish ceased, they again proceeded to take charge of it till the settlement of *Mr. Bailey*, who held it till 1824. The present plaintiff on his ordination became rightfully entitled to hold it. We consider that the reasoning of the Court in the *Proprietors of the Town of Shapleigh* v. *Pillsbury*, 1 *Greenl.* 271, and the *Inhabitants of Bucksport* v. *Spafford*, 3 *Fairf.* 487, goes to support the plaintiff in his claim to maintain this action. The defendant is a mere stranger and exhibits no title.